**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **Diverse Label Printing, LLC,** | ) | Case No. 18-10792 |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**THIRD AMENDED DISCLOSURE STATEMENT FOR**
**THIRD AMENDED PLAN OF LIQUIDATION**

NOW COMES Diverse Label Printing, LLC (the "Debtor"), pursuant to 11 U.S.C. § 1125 and Rule 3016 of the Federal Rules of Bankruptcy Procedure, and respectfully submits this Third Amended Disclosure Statement (as amended, the "Disclosure Statement") in connection with the solicitation of acceptances and rejections with respect to the Third Amended Plan of Liquidation (as amended, the "Plan").  Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Plan.  **A copy of the Plan is attached hereto as Exhibit 1 and incorporated herein by reference.**

The purpose of this Disclosure Statement is to (a) provide holders of Claims and Equity Interests with information regarding the Debtor's history, business, and case, (b) advise holders of Claims and Equity Interests of the provisions of the Plan, alternatives to the Plan, and their rights under the Plan, (c) assist holders of Claims and Equity Interests in making an informed judgment regarding whether they should vote to accept or reject the Plan, and (d) assist the Court in determining whether the Plan complies with the provisions of the Bankruptcy Code and should be confirmed.

## I.    INTRODUCTION

On July 23, 2018, the Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code.  Subsequent to the filing, an Order for relief was entered in the case.  An Official Committee of Unsecured Creditors (the "Committee") has been appointed in the case.  Both the Debtor and the Committee retained counsel to represent their interests in the case.  The Debtor also employed Edward Bidanset and The Finley Group, Inc. as the chief restructuring

1

officer ("CRO"), and Lehman B. Pollard and the firm of Nelson & Company, PA as the accountant (the "Accountant") to assist the Debtor in this proceeding.

On October 1, 2018, the Debtor filed a motion to sell substantially all of the assets of the Debtor, free and clear of all claims, liens, encumbrances and interests, pursuant to a sale procedure which provided for the submission of bids, an auction, and approval by the Court after Notice and Hearing (the "Sale Motion").  RTU, Inc. submitted the highest and best bid at the auction, and on December 7, 2018 an Order was entered approving the Sale Motion (the "Sale Order").  The closing on the sale to the designee of RTU, Inc., Automate Label Solutions, LLC (the "Purchaser") occurred on December 21, 2018 (the "Sale Date").

After the Sale Date, the Debtor ceased all business operations, paid the Secured Claim of its lender, First National Bank of Pennsylvania ("FNB"), and assumed and assigned certain executory contracts and unexpired leases to the Purchaser.  From the Sale Date through the date of the filing of this Plan, the CRO and the Accountant have proceeded to close the books and records and wind up the business affairs of the Debtor.

The Debtor has filed the Plan as a plan of orderly liquidation pursuant to which the Debtor will (i) pay in full all Allowed Administrative Expense Claims, as well as Allowed Priority Claims and Allowed Priority Tax Claims which remain unpaid, and (ii) use Available Cash[1] to pay in full or Pro Rata to the extent of Available Cash: (a) first, Class 1 Allowed Unsecured Claims; (b) second, Class 2 Allowed Subordinated Claims; (c) third, Class 3 Allowed Late Filed Claims; and (d) fourth, Class 4 Allowed Penalty Claims.  To the extent of Available Cash, and after the payment of interest on such Allowed Claims as provided in section 726(a)(5) of the Bankruptcy Code, the Debtor will then distribute any remaining funds to holders of Equity Interests.

The Plan provides for a compromise and settlement of the claims filed by Cargill, Incorporated and Cargill Meat Solutions Corporation (collectively, "Cargill"), which are disputed by the Debtor and the Committee, as set forth in Section V herein.  Confirmation of the Plan would constitute approval of the proposed compromise and settlement of the Cargill Claims pursuant to Bankruptcy Rule 9019; however, in the event the Plan is not confirmed, the proposed compromise and settlement would be withdrawn and would not have any further effect on the determination of

---

[1] "Available Cash" consists of all proceeds recovered or generated from the liquidation of Assets, causes of action (including Bankruptcy Causes of Action), or from any other sources, less payment or provisions for (a) Allowed Secured Claims having a lien upon such Assets, (b) Allowed Administrative Expense Claims, (c) Allowed Priority Claims, and (d) Allowed Priority Tax Claims.

the Cargill Claims or any objections thereto.  Confirmation of the Plan also is contingent upon the entry by the Bankruptcy Court of a final order that is not subject to appeal approving the Global Settlement Agreement which is described in Sections VI and VII herein.

The Debtor does not anticipate that the holders of Allowed Claims in Classes 2, 3 and 4 or holders of Equity Interests will receive any distribution on such claims or equity interests.  The amount of any distribution to holders of Allowed Claims in Class 1 will depend on the validity, extent and priority of the scheduled claim of WDS, Inc. ("WDS") as set forth in Section VII herein.

All creditors and other parties in interest are encouraged to read the Plan carefully and thoroughly, and to review the Plan with their attorneys or other advisors to ascertain its terms, provisions, and conditions and the effect of the Plan on any Claims or Equity Interests which such persons may possess.  The Debtor believes that confirmation of the Plan is in the best interests of creditors.

## II.    PROCEDURAL INFORMATION

Pursuant to the Bankruptcy Code, this Disclosure Statement must be approved by the Court.  Such approval is required by statute and does not constitute a determination by the Court as to the desirability of, or the value, adequacy, or suitability of any consideration offered under the Plan, but does indicate that the Disclosure Statement contains adequate information to permit those claimants and other parties in interest whose acceptance of the Plan is solicited to make an informed judgment about the Plan.

The Debtor prepared this Disclosure Statement to disclose that information available which, in the Debtor's opinion, is material, important and necessary to an evaluation of the Plan, and the material herein contained is intended solely for this purpose.  This Disclosure Statement may not be relied upon for any purpose other than a determination of how to vote on the Plan. Furthermore, the matters addressed, and the discussions contained in this Disclosure Statement are not necessarily sufficient for the formulation of a judgment by any creditor or equity interest holder of whether the Plan is preferable to any alternative thereto.  However, the Debtor as the proponent of the Plan supports the Plan for the reasons explained herein and encourages claimants and other parties in interest to accept the Plan by timely returning a ballot in favor of the Plan.

The Disclosure Statement is submitted in accordance with section 1125 of the Code for the purpose of soliciting acceptance of the Plan from holders of certain claims against and interests in the Debtor.  The persons whose acceptance is sought are those whose claims or interests are

"impaired" by the Plan; *i.e.*--those whose claims or interests are altered by the Plan or who will not receive under the Plan the allowed amounts of their respective claims or interests in cash. Holders of those claims and interests which are not "impaired" are automatically deemed to have accepted the Plan.

If the Plan is rejected by one or more impaired classes of claims or interests, the Plan or a modification thereof may still be confirmed by the Court if the Court determines, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting class or classes of claims or interests impaired by the Plan.  The Debtor will request such a determination (commonly referred to as a "cram down") if the Plan or modification thereof is not accepted by one or more of the impaired classes of claims or interests.

If the Plan or any modification thereof is not accepted by one or more of the impaired classes of claims or interests and is not confirmed by the Court pursuant to the cram down provisions of the Bankruptcy Code, the Debtor may seek to modify the Plan or may convert the case to a proceeding under Chapter 7, in which event the Chapter 7 trustee would review and object to claims, pursue all necessary litigation and make final distributions to creditors and equity interest holders.  By separate order served on all parties in interest, the Court will set a hearing to consider confirmation of the Plan.

A creditor or equity interest holder, in order to vote, must file a Proof of Claim or Interest on or before the date set as the "bar date" for filing all claims.  The bar date for filing claims against the Debtor is set forth in the Plan.  However, any creditor or equity interest holder whose claim or interest is listed in the schedules filed by the Debtor and <u>not</u> identified as disputed, unliquidated or contingent is <u>deemed</u> (to the extent so scheduled) to have filed a claim, and absent objection such claim is deemed allowed and entitled to vote.  In the event an objection is filed with respect to a filed or scheduled claim, the holder of such claim will not be entitled to vote to accept or reject the Plan unless the claim holder files a motion requesting the Court to temporarily allow the claim in an amount which the Court deems proper for the purpose of accepting or rejecting the Plan, and the Court grants such motion prior to the conclusion of the Confirmation Hearing.

A creditor or equity interest holder may vote to accept or reject the Plan by filling out and mailing (as instructed thereon) the ballot provided with this Disclosure Statement.  The Court will set the time by which ballots must actually be filed; and, any ballots received after such time may not be counted.  Regardless of whether a creditor or equity interest holder votes against the Plan,

or whether the creditor or equity interest holder votes at all, such persons will be bound by the terms and treatment set forth in the Plan if the Plan is confirmed by the Court.

Allowance of a claim for voting purposes does not necessarily mean that all or a portion of the claim will be allowed or disallowed for distribution purposes. The Debtor may file an objection to a claim, which will then be allowed or disallowed by the Court after notice and an opportunity for hearing. Tax consequences of any of the transactions proposed by the Plan will depend upon the individual circumstances applicable to each creditor, equity interest holder, or other party in interest, and include factors beyond the Debtor's knowledge. A general discussion of potential tax consequences is contained in the Disclosure Statement.

The various claims of creditors and interests of equity interest holders are all treated under the proposed Plan. There are additional significant provisions contained throughout the Plan that impact the treatment of creditors and equity interest holders. The Plan proposes segregation of the creditors into separate classes, with one additional class comprising the holders of equity interests.

The Debtor or others may solicit your vote for or against the Plan. The cost of any solicitation by the Debtor will be borne by the Estate. No other additional compensation shall be received by any party for any solicitation other than as disclosed to the Court.

**Consummation Of The Plan Is Subject To Numerous Conditions And Variables, And There Can Be No Assurance That The Plan, As Contemplated, Will Be Effectuated. No Representations Or Assurances Concerning The Plan Are Authorized By The Debtor Other Than As Set Forth In This Disclosure Statement. Any Representations Or Inducements Made By Any Person To Secure Your Vote Which Are Other Than Herein Contained Should Not Be Relied Upon By You In Arriving At Your Decision, And Such Additional Representations Or Inducements Should Be Reported To Counsel For The Debtor, Who In Turn Shall Convey Such Information To The Court For Such Action As May Be Deemed Appropriate.**

Certain materials contained in this Disclosure Statement may have been taken directly from other, readily accessible instruments or digests of other instruments. In addition, other information may be made available, upon reasonable written request, to creditors or other parties in interest having standing to request such information. While the Debtor made every effort to retain the meaning of any such instruments or documents or the portions thereof reiterated herein, you are advised that any reliance on the contents of such other instruments or documents should be predicated on a thorough review of the instruments or documents themselves, including the Plan.

### III.   <u>VOTING</u>

If you are in one of the classes of creditors or other parties in interest whose interests are affected by the Plan, it is important that you vote.  To vote to accept or reject the Plan, creditors and other persons or entities having claims against the Debtor falling within any of the impaired classes should indicate their acceptance or rejection on the appropriate ballot.  Any persons holding claims in more than one impaired class must file one ballot for each such class.  Additional ballots may be obtained by written request to Counsel for the Debtor.

A class of claims will have accepted the Plan if it is accepted by class members holding at least two-thirds (2/3) in amount and more than one-half (½) in number of the allowed claims of such class voting on the Plan.  A class of equity interests will have accepted the Plan if it is accepted by class members holding at least two-thirds (2/3) in amount of the allowed interests in such class voting on the Plan.  You are, therefore, urged to fill in, date, sign, and promptly mail the enclosed ballot furnished to you.

**Please Be Sure To Properly Complete The Form And Legibly Identify The Name Of The Claimant Or Equity Interest Holder.  Executed Ballots Must Be Received On Or Before The Return Date Set Forth In The Ballot.  Completed Ballots Should Be Returned To The Address Specified On The Ballot.  Since Mail Delays May Occur, It Is Important That The Ballot Or Ballots Be Mailed Or Delivered Well In Advance Of The Date Specified.  Any Acceptances Or Rejections Of The Plan Received After The Date May Not Be Included In Any Calculation To Determine Whether The Creditors And Equity Interest Holders Have Voted To Accept Or Reject The Plan.**

**This Is A Solicitation By The Debtor Only And Is Not A Solicitation By The Attorneys, Accountants, Or Other Professionals Who May Be Employed By The Debtor, And The Representations Made Herein Are Solely And Exclusively Those Of The Debtor And Not Of Such Attorneys, Accountants, Or Other Professionals.**

### IV.      <u>BACKGROUND AND HISTORY OF THE DEBTOR</u>

The Debtor is a North Carolina limited liability company formed on February 10, 2012.  Prior to the Sale Date, the Debtor was engaged in the production of labels for food, food processing, supermarket, consumer goods, and other uses, and also provided its customers with automation equipment and/or expertise to assist with the application of labels to products (the "<u>Business</u>").  The Debtor was based in Burlington, North Carolina and had approximately 58 employees. The Debtor also leased warehouse space in Tennessee, California, Kansas, Ohio and Colorado.

In January of 2018, a Judgment was entered against WDS, Inc. ("WDS"), an affiliate of the Debtor, as well as Brian Ewert ("Ewert"), the Debtor's majority owner and manager, and Jennifer Maier, the wife of the Debtor's minority owner, in litigation filed by Cargill in the United States District Court for the Western District of North Carolina (the "District Court Litigation"). As a result, prior to the Petition Date, the Debtor hired The Finley Group, Inc. ("Finley Group") to provide Edward Bidanset as the Debtor's interim chief executive officer to lead the day-to-day operations of the Debtor.  Mr. Bidanset was to report directly to Ewert.

On June 26, 2018, an order was entered in the District Court Litigation directing Ewert to transfer control of the Debtor to Finley Group.  After serving as interim chief executive officer for several months and dealing with disruptions to the Business arising out of the District Court Litigation, Finley Group determined, in the exercise of its business judgment, that the financial condition of the Debtor necessitated the reorganization of the Debtor under the protections afforded by Chapter 11 of the Bankruptcy Code.

On July 23, 2018, the Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code and immediately employed Mr. Bidanset and Finley Group as CRO.  On July 31, 2018, Ewert also filed for Chapter 11 bankruptcy protection (the "Ewert Bankruptcy Case").  The Ewert Bankruptcy Case was subsequently converted to Chapter 7 and James B. Angell was appointed as the Chapter 7 trustee (the "Ewert Trustee") in the case.

On August 29, 2018, the Debtor retained Equity Partners HG LLC ("Equity Partners") as its investment banker to market its assets and begin the sale process.  On October 1, 2018, the Debtor filed the Sale Motion, and after receiving four qualifying bids, conducted an auction on December 5, 2018.  RTU, Inc. submitted the highest and best bid at the auction, which included $7,200,000 in cash plus the assumption of post-petition payables in the amount of $702,291.00 (the "Preliminary Purchase Price").  The sale to the Purchaser was approved by the Court on December 7, 2018, and the closing occurred on December 21, 2018 (the "Closing Date").

At the closing, the Purchaser paid the Debtor the sum of $7,200,000.  At or subsequent to the closing, the Debtor paid from the sales proceeds the following as directed by the Court in the Sale Order: (i) $2,261,632.03 to FNB in satisfaction of its secured claims, (ii) $293,627 to Equity Partners as compensation for its services, and (iii) $130,045.82 as a break-up fee to General Data Company, Inc. who served as the stalking horse bidder.  The balance of the sales proceeds in the amount of $4,514,695.15 were retained by the Debtor.

7

Pursuant to Section 2 of the Asset Purchase Agreement between the Debtor and the Purchaser (the "APA"), certain adjustments to the Preliminary Purchase Price were to be made after the Closing Date based upon increases and/or decreases in the Net Book Value of the Debtor's Accounts Receivable, Inventory, Deposits and Prepaids and Assumed Obligations between November 1, 2018 and the Closing Date (the "Purchase Price Adjustment"). Certain expenses relating to the assets sold to the Purchaser also were to be allocated and/or prorated as of the Closing Date (the "Prorations"). On April 19, 2019, the Debtor and Purchaser filed a motion with the Court in which they agreed that the Debtor owed the Purchaser the sum of $869,286.58 in settlement of the Purchase Price Adjustment, the Prorations and certain other claims arising out of the APA (the "Settlement Motion").

After notice and hearing conducted on May 29, 2019, the Court approved the Settlement Motion and the Purchase Price Adjustment in the amount of $869,286.58 was refunded to the Purchaser. In June of 2019, the 503(b)(9) Claims in the aggregate amount of $734,267.47 previously approved by the Court were paid in full. After reserving for accrued and estimated professional fees and other costs of administration, the Debtor estimates that approximately $6,496,424 will be available for payment of allowed claims, inclusive of approximately $237,000 estimated net recoveries on Bankruptcy Causes of Action to avoid and recover preferential transfers. As of August 31, 2019, the filed and scheduled claims (excluding 503(b)(9) claims and claims disallowed or reduced by Court order) in this proceeding total $117,826,134.42,[2] which includes (1) Priority Tax Claims in the aggregate amount of $49,271.17; (2) Unsecured Claims (including the Subordinated Claim of Cargill pursuant to the Cargill Settlement as set forth below) in the aggregate amount of $47,399,742.49; (3) Late Filed Claims in the aggregate amount of $22,582.76; and (4) Penalty Claims in the amount of $70,354,538.

## V.        CARGILL CLAIMS

On November 15, 2018, Cargill, Incorporated and Cargill Meat Solutions Corporation filed Claim Numbers 45 and 47, respectively, in the Debtor's proceeding, each in the amount of $111,172,680 (collectively, the "Cargill Claims")[3]. The Cargill Claims were designated as

---

[2] Cargill, Incorporated and Cargill Meat Solutions Corporation filed duplicate claims in the amount of $111,172,680. This figure excludes the amount of one of the duplicate claims, and the proposed Cargill Settlement would result in Claim Number 45 being disallowed and Claim Number 47 being amended and restated to be on behalf of both Cargill, Incorporated and Cargill Meat Solutions Corporation.

[3] Cargill Claim No. 47 is voluminous but can be viewed through access to the PACER and ECF systems, and a copy can be obtained by written request to Debtor's counsel.

unsecured claims. The Cargill Claims are duplicate claims and are related to the judgment obtained by Cargill in January of 2018 (the "Cargill Judgment") against WDS and its owners, Ewert and Jennifer Maier, in the District Court Litigation.

As contended by Cargill in Exhibit A to Claim Number 47, the Cargill Claims consist of: "(1) at least $110,874,680 plus post-judgment interest ("Liability Claims") because Debtor is liable as a successor to WDS, Inc. ("WDS"), for facilitation of fraud, and as a recipient of fraudulent transfers; and (2) $298,000 plus attorney's fees and costs ("Contempt Claim" and together with the Liability Claim, "Direct Claims") due to Debtor's contemptable actions in the" District Court Litigation. In addition, Cargill contends that it also has "indirect scheduled claims against Debtor through WDS, and requests that Debtor make any payments to Brian Ewert's bankruptcy estate of any amounts owed to ODDS, LLC, any other entity owned by Brian Ewert, or Brian Ewert."

The Debtor was not a party to the District Court litigation and no judgment has been entered against the Debtor with respect to the Cargill Claims. Any amount owed by the Debtor to Cargill pursuant to the Cargill Claims would need to be litigated and established by Cargill in the Bankruptcy Court. The Liability Claims asserted by Cargill include claims which are based upon alternate theories of recovery; namely, facilitation of fraud, fraudulent transfer and successor liability. With respect to the claim based on facilitation of fraud, Cargill would have to establish direct and knowing participation by the Debtor in the scheme to defraud Cargill, litigation which would be very fact intensive and time consuming for both the Debtor and Cargill.

With respect to the claim based on fraudulent transfer, Cargill contends that the Debtor, WDS, Ewert, Jennifer Maier and James Maier[4] conspired to transfer and did in fact transfer substantially all of the assets and business of WDS to the Debtor in order to defraud Cargill, and that these actions were taken after they learned that Cargill intended to pursue the claims against WDS as ultimately filed in the District Court Litigation. Further, Cargill contends that WDS transferred substantially all its assets to the Debtor with the actual intent to hinder, delay and defraud Cargill and other creditors of WDS, and/or that the assets were transferred for less than reasonably equivalent value. Upon information and belief, substantially all of the assets of WDS were transferred to the Debtor between approximately August of 2016 and the Petition Date, and

---

[4] The owners of WDS and DLP were substantially similar: WDS is owned by Ewert and Jennifer Maier and DLP is owned by Ewert and Jennifer Maier's husband, James Maier.

9

the Debtor paid a significant portion of the consideration owed to WDS for the purchase of such assets directly to counsel for Ewert and WDS in the District Court Litigation. Cargill has obtained email communications between DLP employees, Ewert, and counsel for Ewert and WDS which Cargill contends support its claim that the assets were transferred with the actual intent to hinder, delay and defraud Cargill and the creditors of WDS.

The best defense that the Debtor has to Cargill's fraudulent conveyance claim is that fair value was paid by the Debtor in exchange for the assets transferred to the Debtor. However, the assets transferred by WDS to the Debtor were not appraised prior to such transfers, and the Debtor would need to hire experts to determine the fair value of such assets at the time of the transfers in order to defend the claim.

Of greater concern to the Debtor is that Cargill will be able to establish that the Debtor is a successor to WDS under North Carolina law, and that the Debtor is therefore liable for the entire amount of the Cargill Judgment against WDS. Cargill identifies three separate theories for establishing successor liability under North Carolina law (i.e., mere continuation, *de facto* merger, and actual fraud) and states facts in support of each such theory. The following facts which are supported by certain documents provided to the Debtor by Cargill or found in the Debtor's books and records weigh in favor of Cargill's successor liability claim: (i) that WDS transferred a substantial portion of its assets to the Debtor over a period of time after learning that Cargill intended to file the claims asserted in the District Court Litigation, (ii) that the WDS assets were not appraised and the Debtor paid a substantial portion of the consideration for the assets directly to counsel for WDS and Ewert; (iii) that WDS and the Debtor were owned by Ewert and either James or Jennifer Maier, (iv) that after such transfers, the Debtor took over the books and records of WDS (referred to as "Distribution") which it continued to maintain separately from the Debtor's books and records for its existing business (referred to as "Label"); (v) that the Debtor paid some of the outstanding debts owed by WDS after the asset transfers were made; (vi) that WDS assigned certain contracts and leases to the Debtor, and many of the employees of WDS were retained by the Debtor, and (vii) that WDS transferred or directed its customers and business relationships to the Debtor. If proven at trial, the above facts would create a substantial risk that the Court will determine that the Debtor is indeed the successor to WDS.

If successor liability is established, the Debtor as the successor-entity is liable for all the debts, claims and obligations of WDS as the predecessor-entity, and Debtor's counsel believes

there is no basis under North Carolina law to limit the liability to some portion of the Cargill judgment against WDS. If the Cargill Claims are allowed, it is highly likely that approximately $70,354,538 of the claim would be classified as a Class 4 Penalty Claim by the Court and subordinated to other unsecured claims as a penalty, since it represents trebled damages in the District Court Litigation. However, the balance of the claim in an amount up to $40,818,142 would be classified as an Allowed Unsecured Claim of equal priority with other Allowed Unsecured Claims, <u>unless</u> the Debtor could establish that Cargill engaged in inequitable conduct justifying the subordination of all or a portion of the claim to the claims of other creditors.

It is undisputed that some of Cargill's former employees accepted bribes to hide the conduct of WDS. Given this fact, it is possible that the actions of certain Cargill employees could be imputed to the company itself and justify the subordination of its claim. However, Cargill disputes that the former employees' illegal conduct should be imputed to Cargill, as Cargill contends that such conduct was outside the scope of their employment and hidden from Cargill's senior management for years. Ewert, Jennifer Maier and at least one former employee of Cargill each pled guilty to a criminal charge and are awaiting sentencing. For these reasons among others, the outcome of any adversary proceeding seeking to subordinate all or a portion of the Cargill Claims is highly speculative and uncertain.

The Cargill Claims, if not settled, will be vigorously litigated for several years at significant cost to the Debtor and the Estate. If the Cargill Claims are denied or subordinated in their entirety, the Debtor projects that holders of Allowed Class 1 Unsecured Claims would be paid the full amount of their claims in three to four years after the litigation is finalized. However, if Cargill prevails and is allowed a Class 1 Unsecured Claim in the amount of $40,818,142, then distributions to holders of Allowed Class 1 Unsecured Claims could be between 12% and 14% depending on the cost of litigation.

After engaging in mediation and further settlement discussions, the Debtor, the Committee, and Cargill agreed to settle the Cargill Claims, including any Direct Claims or indirect claims as referenced in the Cargill Claims. The Debtor and the Committee estimate that the Cargill Settlement, if approved through confirmation of the Plan, will avoid both the risk and costs of continued litigation and result in a distribution to holders of Allowed Class 1 Unsecured Claims of approximately 54% (assuming the Court denies or subordinates the scheduled claim of WDS).

11

### Summary of Proposed Compromise and Settlement of Cargill Claims

Confirmation of the Plan will constitute approval by the Court of a compromise and settlement of the Cargill Claims pursuant to Bankruptcy Rule 9019, as follows: [5]

1. The Cargill Claims shall be consolidated into Claim Number 47 and Claim Number 45 shall be disallowed as a duplicate claim.

2. Claim Number 47 shall be allowed as (i) a Class 1 Unsecured Claim in the amount of $8,000,000, (ii) a Class 2 Subordinated Claim in the amount of $32,818,142, and (iii) a Class 4 Penalty Claim in the amount of $70,354,538.

3. Any recovery by Cargill on the Cargill Claims from a source other than the Debtor's Estate shall be credited against Cargill's allowed Class 2 Subordinated Claim.

4. Except for the allowance of Claim Number 47, the Debtor, on behalf of itself and the Estate, releases Cargill and Cargill releases the Debtor and the Estate from any obligations, liabilities, causes of action, damages, claims, and demands of any kind whatsoever, at law or in equity, direct or indirect, known or unknown, discovered or undiscovered, any element of which arose or accrued on or before the entry of the Confirmation Order.

5. If the Plan is confirmed, Cargill will support any objection filed by the Debtor seeking the denial or subordination of the scheduled and filed claims of WDS, Inc., ODDS, LLC, RFS, Inc. ("RFS"), Brian Ewert and Tracy Ewert ("Insider Claims").

### The Debtor and the Committee Support The Proposed Compromise and the Plan

The Debtor and the Committee have thoroughly analyzed the facts underlying the Cargill Claims, analyzed the proposed settlement, taking into consideration the strengths and weaknesses of the Cargill Claims and of the Debtor's defenses to such claims, the information and evidence available to defend or subordinate the Cargill Claims and the costs and risks of further litigation. The Debtor and the Committee believe the compromise and settlement set forth herein to be fair, reasonable and in the best interests of the Estate and its creditors.

As shown in the projected distributions attached as Exhibit 3, after payment of estimated administrative expenses and priority claims the Debtor expects to have approximately $6.4 million

---

[5] If this Plan is not confirmed, Cargill reserves the right to assert the entirety of the Cargill Claims as a general unsecured claim, and the Debtor and the Committee reserve the right to challenge the entirety of the Cargill Claims.

available for distribution to holders of Allowed Unsecured Claims. If the Plan is confirmed, a required component of which is approval of the proposed compromise and settlement of the Cargill Claims and approval of the Global Settlement Agreement, creditors holding Allowed Class 1 Claims would receive a distribution of approximately 54% (assuming the Court denies or subordinates the scheduled claim of WDS).

If the proposed compromise and settlement is not approved and the Plan is not confirmed, the Chapter 11 case will likely be converted to Chapter 7, the Cargill Claims, the BCS Guaranty Claim and some or all of the Insider Claims will be litigated by the Chapter 7 trustee, and the funds available for distribution to holders of unsecured claims will be reduced by the costs of such litigation. In addition, litigation of the Cargill Claims, the BCS Guaranty Claim and the Insider Claims will require an extensive period of time for discovery and trial, with the attendant risk that the outcome may be far better, or far worse, than the proposed settlement.

The proposed compromise and settlement will provide creditors with greater certainty as to the amount and timing of distributions and avoid the risk, costs and delay of litigating the Cargill Claims. **ACCORDINGLY, THE DEBTOR AND THE COMMITTEE RECOMMEND THAT CREDITORS VOTE TO <u>ACCEPT</u> THE PLAN.**

## VI.    <u>BCS GUARANTY CLAIM</u>

On November 15, 2018, BCS filed Claim No. 43 arising out of an Equipment Lease Guaranty as more fully set forth therein.  On November 20, 2018, BCS filed an amendment to Claim No. 43 (as amended, the "<u>BCS Guaranty Claim</u>").  The BCS Guaranty Claim was filed in the amount of $441,670.54 and designated as an unsecured claim.  Pursuant to an agreement between BCS and the Debtor, the deadline imposed on the Debtor in the *Final Order Granting Authority to use Cash Collateral* [Docket No. 222] as to the BCS Guaranty Claim has been terminated, and the Debtor may object to the BCS Guaranty Claim or file any claims or causes of action against BCS arising out of or related to the BCS Guaranty Claim, including without limitation, any claim to avoid any obligation to BCS arising out of the Equipment Lease Guaranty referenced in the BCS Guaranty Claim.

The Equipment Lease Guaranty purportedly was executed by Ewert in his capacity as a member of the Debtor on January 26, 2018, approximately six months prior to the Petition Date. Pursuant to the Equipment Lease Guaranty, the Debtor guaranteed the obligation of Ewert and an affiliate, Refrigerated Trucking & Logistics, LLC ("<u>RTL</u>").  The Debtor disputes the amount of

the BCS Guaranty Claim and contends that the claim is avoidable pursuant to section 548 of the Bankruptcy Code, as the Debtor did not receive reasonably equivalent value in return for providing a guaranty of a loan made to an affiliate.

On August 30, 2019, the Debtor, BCS, Cargill, the Ewert Trustee, and Everett B. Saslow, Jr., in his capacity as Chapter 7 trustee for RFS (the "RFS Trustee"), entered into a comprehensive Settlement Agreement resolving claims by and among the parties (the "Global Settlement Agreement").   The Global Settlement Agreement is subject to certain conditions precedent, including (1) the approval of the Global Settlement Agreement by the Court in the bankruptcy cases of the Debtor, Ewert and RFS and, (2) the confirmation of the Plan by the Court by final order that is not subject to appeal.  If the Court approves the Global Settlement Agreement and the Plan is confirmed, then BCS will withdraw the BCS Guaranty Claim.  Contemporaneously with the filing of this Disclosure Statement, the Debtor filed a separate motion to approve the Global Settlement Agreement pursuant to Bankruptcy Rule 9019 and has served a copy of the motion on all creditors and equity interest holders.

## VII.        INSIDER CLAIMS

The Debtor scheduled the following claims on behalf of certain affiliates of the Debtor: (1) an unsecured claim on behalf of ODDS, LLC in the amount of $1,274,351.00; (2) an unsecured claim on behalf of WDS, Inc. in the amount of $1,188,308.00; and (3) an unsecured claim on behalf of RFS in the amount of $10,730.00.  The Ewert Trustee subsequently filed Claim No. 57 on behalf of ODDS, LLC in the amount of the scheduled claim; Claim No. 56 on behalf of WDS, Inc. in the amount of the scheduled claim; and Claim No. 58 on behalf of Ewert in an unknown amount.  Ewert's spouse, Tracy Ewert, also filed Claim No. 59 in an unknown amount arising out of a Premarital Agreement with Ewert dated July 18, 2003.  The claims of ODDS, LLC, WDS, RFS, Ewert, and Tracy Ewert are referred to herein as the "Insider Claims."

The Debtor, the Ewert Trustee and the RFS Trustee have reached an agreement with respect to most of the Insider Claims pursuant to the Global Settlement Agreement referenced in Section VI above.  If the Court approves the Global Settlement Agreement and the Plan is confirmed, then the Ewert Trustee (1) will withdraw Claim Nos. 56, 57 and 58 and waive and release any other claims which the Ewert Trustee may have (or may be authorized to assert) on behalf of the Ewert estate against the Debtor's estate, and (2) will not oppose any objection filed by the Debtor to the scheduled claim of WDS.  The Debtor believes that the unsecured claim scheduled on behalf of

WDS is subject to setoff given the Debtor's compromise and settlement of the Cargill Claims as the Cargill Claims are directly attributable (in part or in full) to the judgment obtained by Cargill against WDS. To the extent any portion of the scheduled claim of WDS is allowed by the Court, the Debtor will seek to subordinate the claim to the Class 1 Allowed Unsecured Claims. Contemporaneously with the filing of this Disclosure Statement, the Debtor filed an objection to the filed and scheduled claim of WDS.

The Debtor has filed an unsecured claim in the RFS case in the amount of $863,403.05. If the Plan is confirmed and the Court approves the Global Settlement Agreement, the Debtor will amend and reduce its claim in the RFS case to $776,528.36 and the RFS Trustee will waive the claim scheduled for RFS in the Debtor's case.

## VIII.   PLAN SUMMARY

**The Following Is A Brief Summary Of Certain Provisions Of The Plan And Should Not Be Relied On For Voting Purposes In Lieu Of A Thorough And Comprehensive Review Of The Actual Plan Itself. The Summary Does Not Purport To Be Complete. Creditors And Equity Interest Holders Are Urged To Read The Plan To Ascertain The Effect Of The Plan On Their Claims And Interests And The Other Provisions Of The Plan. Creditors And Equity Interest Holders Are Further Urged To Consult With Their Attorneys, Tax Advisors, Financial Consultants, Or Other Professionals In Order To Understand More Fully The Plan Or The Effect Of The Plan As To Their Particular Situation.**

The Plan of orderly liquidation contemplates the distribution of cash on hand, recoveries on avoidance actions and recoveries on any other obligations due and owing to the Debtor to the payment of all Allowed Administrative Expense Claims, Allowed Priority Claims, and Allowed Priority Tax Claims which remain unpaid. To the extent of Available Cash, the Debtor also will pay Class 1 Allowed Unsecured Claims, Class 2 Allowed Subordinated Claims, Class 3 Allowed Late Filed Claims, and Class 4 Allowed Penalty Claims. Any Available Cash remaining after creditors are paid in full would be used to pay interest on Allowed Claims as provided in section 726(a)(5) of the Bankruptcy Code, and then distributed to holders of Equity Interests as set forth in the Plan. As previously stated, the Debtor does not anticipate that the holders of Allowed Claims in Classes 2, 3 and 4 or holders of Equity Interests will receive any distribution on such claims or equity interests. If confirmed, a claims review process regarding Allowed Claims (other than Claims which have been allowed by Final Order or the Cargill Claims which will have been settled upon confirmation of the Plan) is anticipated to take approximately 120 days after the Effective Date.

After the Effective Date, the Debtor will make distributions to creditors in accordance with the priorities established by the Bankruptcy Code and the terms of the Plan. The Debtor will not make any distributions on Allowed Claims in Classes 1, 2, 3 or 4 until after the claims review process has been completed and Final Orders have been entered with respect to all Disputed Claims.

The Debtor desires that this Plan be a consensual plan, with all classes of creditors voting to accept the Plan by the requisite majorities required under section 1126 of the Code. In the event any class does not accept the Plan, however, the Debtor requests that the Plan be confirmed by the cram down provisions of section 1129(b) of the Code with respect to such dissenting class or classes. The Debtor reserves the right to modify the Plan pursuant to section 1127 of the Code, consistent with the requirement that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Code.

## IX.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

For purposes of the Plan, Claims and Equity Interests are divided into the following Classes and will receive the treatment summarized below and set forth in detail in the Plan. **A schedule of filed and scheduled claims, by class, is attached hereto as <u>Exhibit 2</u>**. Please note that the schedule was prepared prior to completion of the claims' reconciliation process, and thus the amounts shown are subject to change depending on the final amount of the Allowed Claims in the various Classes.

### A.    <u>Administrative Expense Claims</u>

Administrative Expense Claims are Claims against the Debtor or its Estate for a cost or expense of administration in the case that are entitled to priority or superpriority under sections 364(c)(1), 503(b), 503(c), 507(b) or 1114(e)(2) of the Bankruptcy Code. Administrative Expense Claims will be allowed upon due request or application and in such amounts as may be determined by the Court after Notice and Hearing. However, Administrative Expense Claims which are not timely filed pursuant to the Plan or the *Order Establishing Procedure to Determine Section 503(b)(9) Administrative Expenses* entered in this case on September 12, 2018 [Docket No. 105], will be disallowed, and the holder of such Administrative Expense Claim shall be forever barred, estopped, and permanently enjoined from asserting such claim against the Debtor or its Estate.

Compensation for legal, financial, advisory, accounting and other professional services, and reimbursement of expenses awarded or allowed under sections 329, 330(a) or 331 of the

16

Bankruptcy Code ("Professional Services Claims"), will be allowed and paid in such amounts as may be determined by the Court until such time as a Final Decree is entered in the case. Professionals will be compensated for services rendered in such capacity and reasonably necessary to the administration of the Estate, upon an hourly basis and at their customary hourly rates not to exceed reasonable compensation for such services. Requests for allowance of Professional Services Claims will be filed with the Court on a calendar quarter basis after the Effective Date.

All fees and charges assessed against the Estate under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930 will be paid on a quarterly basis in accordance with the Bankruptcy Rules until such time as a Final Report is filed in the case.

With respect to all other Administrative Expense Claims (other than administrative expense claims under 11 U.S.C. §503(b)(9), for which the deadline to file such claims has already expired and all allowed §503(b)(9) claims have been paid), requests for allowance of such Claims must be filed with the Court within 30 days after the Effective Date, or such other date as may be established by the Court. **ANY SUCH ADMINISTRATIVE EXPENSE CLAIM THAT IS NOT TIMELY FILED SHALL BE DISALLOWED AND THE HOLDER OF SUCH CLAIM SHALL BE FOREVER BARRED, ESTOPPED, AND PERMANENTLY ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE EXPENSE CLAIM AGAINST THE DEBTOR OR ITS ESTATE.**

With respect to each Allowed Administrative Expense Claim, and except as otherwise ordered by the Court, the Debtor will pay such claim in full on or before the later of (i) the Effective Date or (ii) as soon thereafter as the allowed amount of such Claim has been determined by the Court pursuant to a Final Order.

The schedule of estimated claims attached hereto as Exhibit 2 provides an estimate of the Administrative Expense Claims known to the Debtor as of the date of the filing of the Disclosure Statement; however, the deadline for objections to timely filed Administrative Expense Claims under 11 U.S.C. §503(b)(9) has expired and such claims are not subject to further objection and have been paid in full by the Debtor.

**B. Priority Claims**

A Priority Claim includes a Claim that is entitled to priority under sections 507 or 364 of the Bankruptcy Code, excluding Priority Tax Claims. The Debtor will pay all Allowed Priority Claims in full on or before the later of (i) 30 days after the deadline to file objections to Claims

has expired pursuant to section 13.1 of the Plan, or (ii) if disputed, 30 days after the allowed amount of such Claim has been determined by the Court pursuant to a Final Order.

The Debtor is not aware of the existence of any unpaid Priority Claims as of the date of the filing of the Plan and Disclosure Statement, other than the Class 3 Late Filed Claim of Troy Nettles in the amount of $2,489.75 that was filed as a Priority Claim.

### C. Priority Tax Claims

A Priority Tax Claim includes a Claim for federal, state or local taxes that is entitled to priority under sections 507 or 364 of the Bankruptcy Code. The Debtor will pay all Allowed Priority Tax Claims in full, with interest at the applicable statutory rate, on or before the later of (i) 30 days after the deadline to file objections to Claims has expired pursuant to section 13.1 of the Plan, or (ii) if disputed, 30 days after the allowed amount of such Claim has been determined by the Court pursuant to a Final Order.

The schedule of estimated claims attached hereto as Exhibit 2 provides an estimate of the Priority Tax Claims known to the Debtor as of the date of the filing of the Disclosure Statement.

### D. Classes Of Claims

**Class 1** consists of all Unsecured Claims scheduled or filed in the Debtor's proceeding, including a Class 1 Allowed Unsecured Claim of Cargill in the amount of $8,000,000 pursuant to the Cargill Settlement set forth in Section V of the Disclosure Statement. Each holder of an Allowed Unsecured Claim will receive its Pro Rata share of Available Cash. Distributions to holders of Allowed Unsecured Claims shall be made in one final installment on the date described in Section 13.3 of the Plan. Section XII of the Disclosure Statement (including Exhibits 3) provides the projected distributions to holders of Class 1 Allowed Unsecured Claims; provided however, as noted above, distributions to holders of Class 1 Allowed Unsecured Claims can only be projected within a range of outcomes until such time as the claims review process is completed, including a final determination of the amount and treatment of the scheduled claim of WDS.

**Class 2** consists of all Subordinated Claims, including a Class 2 Allowed Subordinated Claim of Cargill in the amount of $32,818,142 pursuant to the Cargill Settlement set forth in Section V of the Disclosure Statement. As noted above, the Debtor contends that any portion of the scheduled claim of WDS allowed by the Court should be subordinated to all other Class 1 Allowed Unsecured Claims and transferred from Class 1 to Class 2. Each holder of an Allowed Subordinated Claim will receive its Pro Rata share of Available Cash after the payment in full of

18

the Class 1 Allowed Unsecured Claims.  Distributions to holders of Allowed Subordinated Claims shall be made in one final installment on the date described in Section 13.3 of the Plan.  Section XII of the Disclosure Statement (including Exhibits 3) provides the projected distributions to holders of Class 2 Allowed Subordinated Claims, if any.

**Class 3** consists of all Late Filed Claims.  Each holder of an Allowed Late Filed Claim will receive its Pro Rata share of Available Cash after the payment in full of the Class 1 Allowed Unsecured Claims and the Class 2 Allowed Subordinated Claims.  Distributions to holders of Allowed Late Filed Claims shall be made in one final installment on the date described in Section 13.3 of the Plan.  Section XII of the Disclosure Statement (including Exhibits 3) provides the projected distributions to holders of Class 3 Allowed Late Filed Claims, if any.

**Class 4** consists of all Penalty Claims, for a fine, penalty or forfeiture, or for multiple, exemplary or punitive damages, and not compensation for actual pecuniary loss suffered by the holder of such claim, including $70,354,538 of the Cargill Claims pursuant to the Cargill Settlement set forth in Section V of the Disclosure Statement.  Each holder of an Allowed Penalty Claim will receive its Pro Rata share of Available Cash after the payment in full of the Class 1 Allowed Unsecured Claims, the Class 2 Allowed Subordinated Claims, and the Class 3 Allowed Late Filed Claims.  Distributions to holders of Allowed Penalty Claims shall be made in one final installment on the date described in Section 13.3 of the Plan. Section XII of the Disclosure Statement (including Exhibits 3) provides the projected distributions to holders of Class 4 Allowed Penalty Claims, if any.

### E.  <u>Class of Equity Interests</u>

**Class 5** consists of the holders of Equity Interests in the Debtor. The holders of Equity Interests shall not receive or retain any property on account of such Equity Interests under the Plan; <u>provided however</u>, in the event all Allowed Claims have been paid in full to the extent provided in the Plan, and there is Available Cash remaining for distribution, holders of Allowed Claims shall be paid interest at the legal rate on such Allowed Claims to the extent necessary to pay each holder of any such Allowed Claim property of a value, as of the Effective Date, equal to the allowed amount of such claim, and any remaining Available Cash would be distributed Pro Rata to the holders of Equity Interests.  Section XII of the Disclosure Statement (including Exhibits 3) provides the projected distributions to holders of Class 5 Equity Interests, if any.

## X.      MEANS FOR EXECUTION OF THE PLAN

The Plan contemplates that upon entry of the Confirmation Order, the Assets shall not vest in any subsequent entity but instead shall remain property of the Estate.  The Debtor believes that all Assets have been collected, recovered and/or liquidated post-petition, with most of the Assets being sold to the Purchaser pursuant to the APA.  The funds that will be available to pay Allowed Claims in this proceeding include (i) any cash on hand in the Debtor's Estate as of the Effective Date, and (ii) any recoveries from causes of action, including Bankruptcy Causes of Action.

### A.   Timing of Distributions

The Debtor will make distributions to holders of Allowed Administrative Expense Claims, Allowed Priority Claims, and Allowed Priority Tax Claims as provided in Section 4 of the Plan. The Debtor will make one final distribution to holders of Allowed Claims or Equity Interests in Classes 1 through 5 (the "Class Distributions") on a date determined by the Debtor prior to the filing of the Final Report; provided, however, no Class Distributions shall be made until after the claims review process has been completed and Final Orders have been entered with respect to all Disputed Claims.  Any distributions to holders of Allowed Claims or Equity Interests under the Plan shall be made in accordance with Section 13.3 of the Plan at the address of each such holder as set forth on the schedules filed with the Court unless superseded by the address as set forth on the proof of claim filed by such holder or other subsequent writing notifying the Debtor of a change of address.

### B.   Management of Debtors

After the Effective Date, the Debtor shall continue in existence for the purpose of (i) winding–down its affairs, (ii) liquidating, by conversion to cash or other methods, any remaining Assets of the Estate as expeditiously as reasonably possible, (iii) enforcing and prosecuting causes of action, claims, interests, rights and privileges of the Debtor and its Estate not otherwise waived, released, or enjoined herein, (iv) resolving Disputed Claims, (v) administering the Plan and taking such actions as are necessary to effectuate the Plan, and (vi) filing appropriate tax returns.  The Finley Group by and through the CRO shall continue to manage the Debtor after the Effective Date, with reasonable compensation determined on an hourly basis and reimbursement for actual and necessary expenses as may be allowed by the Court after notice and hearing.

C. **Litigation**

The Debtor will have the exclusive right to pursue any and all claim objections and causes of action (including all Bankruptcy Causes of Action) not otherwise waived, released or enjoined herein, and any and all such causes of action will be brought in the Court and will be governed by Bankruptcy Rules 7001 et seq. The Debtor has estimated net recoveries of approximately $237,000 on Bankruptcy Causes of Action to avoid and recover preferential transfers. Any compromise or other settlement of a controversy by or on behalf of the Debtor shall be subject to approval by the Court after notice and hearing, in accordance with the Bankruptcy Rules.

The Debtor has previously discussed in Sections V, VI and VII the proposed compromise and settlement of the Cargill Claims, the BCS Guaranty Claim and most of the Insider Claims. Contemporaneously with the filing of the Disclosure Statement, the Debtor filed a motion to approve the Global Settlement Agreement and has requested that the motion be considered by the Court in conjunction with the Confirmation Hearing. If the Court does not approve the Global Settlement Agreement, the Plan will not be confirmed as the approval of the Global Settlement Agreement is a condition precedent to the effectiveness of the Plan as set forth in Section 14.3 of the Plan.

The Debtor is in the process of investigating the potential avoidance and recovery of payments made to creditors of the Debtor within 90 days prior to the Petition Date. There are several probable defenses to such actions which may reduce any potential recovery, as the Bankruptcy Code protects certain payments (such as those made in the ordinary course of business) from such avoidance actions. Within 90 days prior to the Petition Date, the Debtor transferred approximately $7.9 million to creditors; however, the Debtor estimates that it will be able to recover only a small percentage of the transfers through settlements or litigation, depending on the defenses available to such creditors.

D. **Executory Contracts and Leases**

Except as otherwise set forth in the Confirmation Order, all executory contracts and unexpired leases existing on the Effective Date which have not been assumed and assigned, or in the alternative rejected, pursuant to a prior Order of the Bankruptcy Court shall be deemed rejected and entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of such executory contracts and unexpired leases as of the Effective Date. **A CLAIM FOR DAMAGES ARISING FROM THE REJECTION OF AN**

EXECUTORY CONTRACT OR UNEXPIRED LEASE SHALL BE FOREVER BARRED AND SHALL NOT BE ENFORCEABLE AGAINST THE DEBTOR'S ESTATE UNLESS A PROOF OF CLAIM IS SERVED ON THE DEBTOR AND FILED WITH THE COURT WITHIN THIRTY (30) DAYS FROM THE EFFECTIVE DATE, OR SUCH OTHER DEADLINE AS MAY BE SET BY THE COURT, AND SAID PROOF OF CLAIM IS DETERMINED TO BE AN ALLOWED CLAIM.

## XI.  DISCHARGE AND RELEASE

As the Plan provides for the liquidation of all assets of the Estate and the Debtor will not continue business operations, the Plan does not provide for the discharge of any claims or liabilities. However, all proceedings and court actions seeking to establish or enforce pre-petition liabilities and claims of any nature against property of the Estate or priorities received or retained by any creditor with respect to debts and obligations of the Debtor shall be permanently stayed and treated as specifically provided for in the Plan.

## XII.  PLAN PROJECTIONS AND LIQUIDATION ANALYSIS

**Projections as to Plan Payments for creditors and equity interest holders are attached to the Disclosure Statement as Exhibits 3. Please note that the projections set forth in Exhibit 3 assume that the Court denies the scheduled claim of WDS.**

### A.  Plan Projections

Confirmation of the Plan will constitute approval of the proposed compromise and settlement of the Cargill Claims as set forth above, and distributions to creditors will be affected by the extent to which the scheduled claim of WDS is allowed, denied or subordinated by the Court. The projections set forth in Exhibits 3 assume that the Court denies the scheduled claim of WDS. If the Court allows the scheduled claim of WDS as a Class 1 Unsecured Claim and denies any request to subordinate the claim, then the Debtor projects that distributions to Class 1 Allowed Unsecured Claims will be approximately 49% as opposed to 54%.

### B.  Liquidation Analysis

In the event the Plan is not confirmed and the Debtor's case is converted to Chapter 7, the Court would appoint a Chapter 7 trustee for the Estate, who would proceed to liquidate any remaining Assets, abandon any Assets that had no net liquidation value, object to claims as deemed necessary, and pursue causes of action in the trustee's discretion. The Chapter 7 trustee also would retain professionals to represent the trustee, such as attorneys and accountants, and the fees and

expenses of the Chapter 7 trustee and the trustee's professionals would be administrative expenses having priority over any outstanding claims or other administrative expenses incurred prior to the date of conversion to Chapter 7.

**A Liquidation Analysis for the Debtor's Estate is attached to the Disclosure Statement as Exhibit 4.**  As reflected in the Liquidation Analysis, in a Chapter 7 scenario, the additional expenses associated with Chapter 7 would likely result in a reduced dividend to unsecured creditors in the case and considerable delay.  Importantly, if the Plan is not confirmed and the Debtor's case is converted to Chapter 7, Cargill, BCS, the Ewert Trustee and the RFS Trustee will be entitled to assert the entirety of their respective claims as general unsecured claims, subject to objection by the Chapter 7 trustee.  Accordingly, the Debtor believes that the distribution set forth in the proposed Plan will be greater than could be obtained in a Chapter 7.

## XIII.  FINANCIAL INFORMATION

At or shortly after the Petition Date, the Debtor filed Schedules of Assets and Liabilities and a Statement of Financial Affairs.  Monthly reports have been and shall continue to be filed by the Debtor through and including the Effective Date, and thereafter a post-confirmation report shall be filed on a quarterly basis until the filing of the Final Report.  The quarterly reports shall be filed by the end of the month next following the report period and a copy served upon the Bankruptcy Administrator.

The Schedule of Assets and Liabilities, the Statement of Financial Affairs, the monthly reports and the quarterly reports may be inspected by interested parties in order to obtain a broader financial picture of the Debtor and its Estate.  These may be examined on-line through the Court's website.

## XIV.  TAX CONSEQUENCES OF THE PLAN

The federal income tax consequences of the Plan are subject to significant uncertainties, and this summary does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers.

The Debtor is a limited liability company which reports taxable income or loss as part of the income tax return filed by its members, and consequently, the Debtor or the Estate are not responsible for any income tax which may become due nor may the Debtor or the Estate realize any tax benefits from any loss reportable for income tax purposes, whether for prior, current or prospective periods.  To the extent any gains from the sale of property or income from the

23

cancellation of debt is reportable as a result of consummation of the Plan, such gains or income would flow through the Debtor and its Estate to the members.

Creditors holding Allowed Claims will receive cash payments as provided in the Plan in amounts which may result in less than full payment.  The extent to which the unpaid balance of the Allowed Claim (or any portion of the underlying claim which is asserted but is not allowed by the Court) can be deducted for income tax purposes by the holder of such claim, as well as the timing for recognition of revenues, gains or losses for income tax purposes, is dependent upon the particular creditor and cannot be addressed by the Debtor due to the multiplicity of factors which may be involved.  The amount of the income gain or loss, and its character as ordinary income or loss or capital gain or loss, as the case may be, will depend upon the nature of the claim of each particular creditor.

The method of accounting utilized by a creditor for federal income tax purposes may also affect the tax consequences of a distribution.  In general, the amount of gain (or loss) recognized by any such creditor will be the difference between (i) the creditor's basis for federal income tax purposes, if any, in the Claim; and (ii) the amount of the distribution received.  Whether the distribution will generate ordinary income or capital gain will depend upon whether the distribution is in payment of a Claim or an item which would otherwise generate ordinary income on the one hand or in payment of a Claim which would constitute a return of capital.

## XV.    PROVISIONS FOR IMPAIRED CREDITORS NOT ACCEPTING PLAN

With respect to any Class of Claims impaired by and not accepting this Plan by the requisite majority in number and two-thirds (2/3) in dollar amount of those casting ballots, the order confirming the Plan will fairly and equitably provide the requisite protection required by applicable provisions of the Bankruptcy Code.  With respect to Equity Interests, holders of Equity Interests shall not receive any distributions under the Plan unless all Allowed Claims are paid in full, with interest.

The Bankruptcy Code provides that the Plan may be confirmed even if it is not accepted by all impaired Classes.  In order to be confirmed without the requisite number of acceptances of each impaired Class, the Court must find that at least one impaired Class has accepted the Plan without regard to the acceptance of "insiders" (as that term is defined in the Bankruptcy Code), and the Plan does not discriminate unfairly against, and is otherwise fair and equitable to, such impaired Class. To the extent confirmation by "cramdown" is necessary or required, the Debtor

requests confirmation thereof pursuant to section 1129(b) of the Code without further motion or notice, which request shall be considered (if necessary) at the Confirmation Hearing.

## XVI. DISPUTED CLAIMS AND OBJECTIONS TO CLAIMS

The Debtor may file an objection to any claim (other than Claims which have been allowed by Final Order, or the Cargill Claims as allowed by the Cargill Settlement) within one hundred twenty (120) days after the Effective Date; provided however, timely filed Section 503(b)(9) Administrative Expense Claims are not subject to further objection, are deemed Allowed Administrative Expense Claims and have been paid in full. Objections not filed within such time shall be deemed waived unless the period within which to file objections to claims is extended by Order of this Court as provided in the Plan. **THE ABSENCE OF AN OBJECTION PRIOR TO THE EFFECTIVE DATE, WHETHER AS TO A SCHEDULED OR FILED CLAIM, SHALL NOT BE DEEMED AN ACCEPTANCE OF ANY CLAIM NOR A WAIVER OF THE RIGHT TO OBJECT TO ANY CLAIM, AND THE HOLDER OF ANY SUCH CLAIM SHALL NOT BE ENTITLED TO ASSERT RELIANCE UPON ANY IMPLIED ACCEPTANCE OF SUCH CLAIM WHEN VOTING TO ACCEPT OR REJECT THE PLAN.**

Except as otherwise provided in the Plan, any claim, or portion thereof, which is to be paid in cash under the Plan and which is challenged, shall be protected by requiring the Debtor to segregate and set aside in an escrow account a reserve based on the Court's estimate of such claim and sufficient to treat said claim in the same fashion as though the objection were denied. The reserve so segregated shall be distributed in accordance with the Plan in the event the objection is overruled, or a dispute is resolved in favor of the party asserting the claim. In the event the disputed claim is disallowed, the retained cash so segregated shall be retained by the Debtor and available for distribution in accordance with the provisions of the Plan, with the disallowed claimant being excluded from the appropriate Class.

## XVII. COMMITTEE DISSOLVED.

The Committee shall remain in existence until Class Distributions are made pursuant to Section 13.3 of the Plan, and thereafter, the Committee shall be dissolved and its members shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from the Debtor's Chapter 11 case; provided however, (i) after the Effective Date, the Committee's role shall be limited to ensuring that Class Distributions are made consistent

with the Plan, and (ii) the amount paid by the Debtor or its estate to professionals retained by the Committee ("Committee Counsel") for fees incurred after the Effective Date shall be capped at $5,000, provided that the Class Distributions are made in accordance with the Plan.  The retention and employment of Committee Counsel shall terminate upon the dissolution of the Committee as set forth herein.

## XVIII. MATTERS TO CONSIDER BEFORE VOTING ON THE PLAN

The confirmation of the Plan is the ultimate goal of this case.  In a Chapter 11 case, only the debtor may file a plan of reorganization within the exclusivity period provided by section 1121(b) of the Bankruptcy Code.

The Bankruptcy Code permits the adjustment of secured debt, unsecured debt and interests. Even if an impaired class votes against the Plan, implementation of the Plan is still possible so long as (i) the Plan does not discriminate unfairly against the impaired class and (ii) is fair and equitable with respect to the impaired class.  A plan is fair and equitable with respect to an impaired class if such class is afforded certain treatment required by the Bankruptcy Code, broadly defined as giving a claimant the full value of her claim or interest.  Such value is determined by the Court and balanced against the treatment afforded the dissenting class of creditors.

One requirement for confirmation by the Court of a Chapter 11 plan is that the plan be in the best interests of creditors and interest holders.  In simple terms, this test requires that creditors and interest holders receive more under the plan than they would obtain if the debtor were liquidated and the proceeds distributed in accordance with bankruptcy liquidation priorities.  The Court, in considering this factor, need not consider any other alternatives to the Plan but liquidation.

Another requirement for confirmation of a Chapter 11 plan is that the plan be feasible.  In considering "feasibility" the Court is only required to determine whether the plan can be accomplished.  This entails determining the availability of cash for payments required at and after the effective date of the plan, and any other factor which might make it impossible for the debtor to accomplish that which it proposes to accomplish in the plan.  In addition, in order to confirm a plan, the Court must find that the plan was proposed in good faith and that the plan and the debtor are in compliance with the applicable provisions of the Bankruptcy Code.  Finally, similar to the requirement that the Court find the plan to be feasible, the Court must find that liquidation or

further reorganization is not likely to occur after implementation of the plan, except to the extent the plan provides for such liquidation.

The determination by the Court that the plan is fair, equitable and feasible occurs at the confirmation hearing. The Court's adjudication of these matters does not constitute an expression of the Court's opinion as to whether the plan is a good one nor does it constitute an opinion by the Court regarding any debt or interest or securities issued to creditors under the plan.

Although this Disclosure Statement is intended to provide information to assist in the formation of a judgment as to whether to vote for or against the Plan, and although creditors are not being offered, through that vote, an opportunity to express an opinion concerning alternatives to the Plan, the only likely alternative to the Plan is the liquidation of the Debtor through conversion of this case to one under Chapter 7. This would result in the appointment of a Chapter 7 trustee, a new notice period for the filing of claims, and additional administrative costs, including a commission to any Chapter 7 trustee. Importantly, dividends to holders of Claims would be delayed and reduced in amount as reflected in Exhibit 4.

The materials provided in this Disclosure Statement are intended to assist you in voting on the Plan in an informed fashion. If the Plan is confirmed, you will be bound by its terms; therefore, you are urged to review this material and to make such further inquiries as you may deem appropriate, then cast an informed vote on the Plan. The Debtor solicits your acceptance of the Plan as being in the best interests of creditors in this case.

Respectfully submitted on behalf of the Debtor, this the 9th day of September, 2019.

/s/ Vicki L. Parrott

**Counsel for the Debtor:**
John A. Northen, NCSB #6789
jan@nbfirm.com
Vicki L. Parrott, NCSB #25449
vlp@nbfirm.com
Northen Blue, LLP
Post Office Box 2208
Chapel Hill, NC 27515-2208
Telephone: 919-968-4441

**EXHIBIT 1:**
**THIRD AMENDED PLAN OF LIQUIDATION**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**GREENSBORO DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **Diverse Label Printing, LLC,** | ) | **Case No. 18-10792** |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**THIRD AMENDED PLAN OF LIQUIDATION**

NOW COMES Diverse Label Printing, LLC (the "Debtor"), pursuant to 11 U.S.C. §1129 and Rule 3016 of the Federal Rules of Bankruptcy Procedure, and respectfully proposes the following Third Amended Plan of Liquidation (as amended, the "Plan").

1.     **INTRODUCTION**.   On July 23, 2018 (the "Petition Date"), the Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code and an Order for relief was entered.  Pursuant to various orders entered by the Court in response to the Debtor's motions and after Notice and Hearing, the Debtor obtained authority for the use of cash collateral and otherwise complied with all requirements for operation and filing of necessary reports with the Court as mandated by the Bankruptcy Code, the Bankruptcy Rules, and the local rules of the Court. On December 21, 2018, the Debtor sold substantially all of its assets to RTU, Inc. or its designee, free and clear of all claims, liens, encumbrances and interests, pursuant to a sale procedure approved by the Court.  The Debtor submits this Plan as a plan of orderly liquidation and distribution.

2.     **DISCLOSURE STATEMENT**.  Reference is made to the Third Amended Disclosure Statement submitted for the Plan and filed on the same date herewith (as amended, the "Disclosure Statement") for a brief discussion of the Debtor's history, business, results of operations, historical financial information and properties, the results of post-petition operations, and an analysis of the Plan.  All creditors entitled to vote on the Plan should review the Disclosure Statement before voting to accept or reject the Plan.  In addition, there may be other agreements and documents that have been filed which are referenced in the Plan and/or the Disclosure Statement and which are available for review.  No solicitation materials, other than the Disclosure

1

Statement, have been authorized by the Court for use in soliciting acceptances or rejections of the Plan.

    **3.**    <u>**DEFINITIONS.**</u>    For purposes of this Plan and accompanying Disclosure Statement, the following definitions shall apply and, unless otherwise indicated, the singular shall include the plural:

    **3.1.**    <u>Administrative Expense Claim</u>:  Means a Claim against the Debtor or its Estate for a cost or expense of administration in the case that is entitled to priority or superpriority under sections 364(c)(1), 503(b), 503(c), 507(b) or 1114(e)(2) of the Bankruptcy Code.

    **3.2.**    <u>Allowed Claim</u>:  When used:

    **3.2.1.**  with respect to any Claim other than an Administrative Expense Claim, means a Claim that:

    **3.2.1.1.**  is not a Disputed Claim and (a) for which a proof of claim was filed on or before the date designated by the Court as the last day on which to file such proofs of claim in the Debtor's proceeding, or (b) which is listed in the schedules filed by the Debtor (unless listed as unliquidated, disputed or contingent) and, in either case, to which (i) no objection has been filed within the applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or order of the Court, or (ii) an objection has been timely filed and determined by Final Order, and then only to the extent the order allows such Claim; or

    **3.2.1.2.**  is allowed (a) in any stipulation or other agreement between a holder of a Claim and the Debtor that, (i) if executed prior to the Effective Date, is approved by the Court, or (ii) if executed after the Effective Date, is not subject to Court approval, establishing the amount and nature of a Claim; (b) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Court; (c) pursuant to a Final Order; or (d) pursuant to the terms of the Plan.

    **3.2.2.**  with respect to an Administrative Expense Claim, means an Administrative Expense Claim that is allowed (a) in any stipulation or other agreement between a holder of a Claim and the Debtor that, (i) if executed prior to the Effective Date, is approved by the Court, or (ii) if executed after the Effective Date, is not subject to Court approval, establishing the amount and nature of a Claim; (b) in any contract, instrument or other agreement entered into in connection with the Plan and, if prior to the Effective Date, approved by the Court; (c) pursuant to a Final Order; or (d) pursuant to the terms of the Plan.

**3.2.3.**   Claims estimated and temporarily allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Court shall not be considered "Allowed Claims" hereunder.

**3.3.**   Assets:  All of the Debtor's property, rights and interests that are property of the Debtor's estate pursuant to section 541 of the Bankruptcy Code.

**3.4.**   Available Cash:  All proceeds recovered or generated from the liquidation of Assets, causes of action (including Bankruptcy Causes of Action), or from any other sources, less payment or provisions for (a) Allowed Secured Claims having a lien upon such Assets, (b) Allowed Administrative Expense Claims, (c) Allowed Priority Claims, and (d) Allowed Priority Tax Claims.

**3.5.**   Bankruptcy Administrator:  The United States Bankruptcy Administrator for the Middle District of North Carolina.

**3.6.**   Bankruptcy Causes of Action:  Any claim or cause of action which may be asserted by a debtor or a debtor-in-possession under sections 541, 542, 543, 544, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code.

**3.7.**   Bankruptcy Code:  Provisions of Title 11, United States Code, as amended from time to time and applicable to this case.

**3.8.**   Bankruptcy Rules:  The Federal Rules of Bankruptcy Procedure and the local rules of the Court, as amended from time to time and applicable to this case.

**3.9.**   Cargill:  Cargill, Incorporated and Cargill Meat Solutions Corporation, collectively.

**3.10.**   Cargill Settlement:  The proposed compromise and settlement of the claims filed or otherwise asserted by Cargill against the Debtor or its estate, as set forth in Section 7 of the Plan.

**3.11.**   Claim:  A claim as defined in section 101(5) of the Bankruptcy Code.

**3.12.**   Claims Bar Date:  The date by which a proof of claim must be filed with the Court, which shall be, as applicable, (a) with respect to all creditors except a governmental unit, November 21, 2018, (b) with respect to a governmental unit, January 19, 2019, and (c) with respect to claims arising from the rejection of any executory contract or unexpired lease, thirty (30) days from the Effective Date, or such other (whether earlier or later) deadline as may be set by the Court generally or with respect to any lease or contract rejected in accordance with Section 9.3.

3

**3.13.** Class: A class of Claims or Equity Interests, as described in Section 5 of the Plan.

**3.14.** Committee: The Official Committee of Unsecured Creditors pursuant to the Order Appointing Committee of Unsecured Creditors in a Chapter 11 Reorganization filed in the Debtor's proceeding on August 24, 2018 [Docket No. 90].

**3.15.** Confirmation Date: The date on which the Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

**3.16.** Confirmation Order: The Order of the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**3.17.** Court: The United States Bankruptcy Court for the Middle District of North Carolina, and any district court or appellate court that exercises jurisdiction over this case.

**3.18.** Debtor: Diverse Label Printing, LLC.

**3.19.** Disallowed Claim: A Claim that has been disallowed by a Final Order or a stipulation or other agreement between the holder of a Claim and the Debtor.

**3.20.** Disputed Claim: Any Claim (a) scheduled by the Debtor as disputed, contingent or unliquidated, unless a proof of claim was timely filed, (b) filed but with respect to which an objection has been interposed which has not been resolved by a withdrawal of such objection, agreement approved by the Court, or entry of a Final Order, or (c) is set forth in an improper proof of claim or a proof of claim untimely filed.

**3.21.** Effective Date: The first day of the month following the Confirmation Date unless the Confirmation Order has been stayed pending appeal.

**3.22.** Equity Interest: Any membership interests issued by the Debtor and outstanding immediately prior to the Petition Date, and any options, warrants or other rights with respect thereto (or as provided for in other instruments evidencing an ownership interest or the right to purchase or demand the issuance of any of the foregoing in the Debtor), including, without limitation, any (a) redemption, conversion, exchange, voting, participation and dividend rights (including any rights in respect of accrued and unpaid dividends), (b) liquidation preferences, and (c) membership interest options and warrants.

**3.23.** Estate: Property of the Debtor's estate as defined by section 541 of the Bankruptcy Code and other applicable law.

4

**3.24.**　__Final Consummation__:　The consummation of all things contained in or provided for in the Plan necessary for the entry of a Final Decree.

**3.25.**　__Final Decree__:　The final decree entered by the Court pursuant to Bankruptcy Rule 3022.

**3.26.**　__Final Order__:　An order or judgment of the Court as entered on the docket of the Court, (a) that has not been reversed, stayed, modified or amended, and as to which the time to appeal or petition for certiorari or move for a new trial, reargument or rehearing has expired, and as to which no appeal or petition for certiorari or other proceeding for a new trial, reargument or rehearing that has been timely taken is pending, or (b) as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order.

**3.27.**　__Final Report__:　A report to be filed by the Debtor with the Court upon and after completion of all acts required to achieve Final Consummation of the Plan, which report shall include, but not be limited to, all information necessary to meet the reporting requirements of the Court, the Bankruptcy Administrator, and the Plan.

**3.28.**　__Late Filed Claim__:　A Claim with a priority equal to that priority set forth in section 726(a)(3) of the Bankruptcy Code and tardily filed on or before the Confirmation Date.

**3.29.**　__Liabilities__:　Any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, Bankruptcy Causes of Action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, agreement, employment, exposure or other occurrence taking place on or prior to the Effective Date.

**3.30.**　__Lien__:　A deed of trust, mortgage, judgment lien, materialmen's lien, statutory lien, security interest, pledge, assessment, lease, adverse claim, levy, charging order, or other encumbrance of any kind, including any "lien" as defined in section 101(37) of the Bankruptcy Code.

**3.31.**　__Notice and Hearing__:　Notice and hearing as defined by section 102 of the Bankruptcy Code.

5

**3.32.**  Penalty Claims:  A Claim for a fine, penalty or forfeiture, or for multiple, exemplary or punitive damages, to the extent such fine, penalty, forfeiture or damages are not compensation for actual pecuniary loss suffered by the holder of such claim, with a priority equal to that priority set forth in section 726(a)(4) of the Bankruptcy Code.

**3.33.**  Petition Date:  July 23, 2018.

**3.34.**  Plan:  This plan of liquidation for the Debtor, and all exhibits attached hereto or referenced herein, as the same may be amended, modified or supplemented from time to time.

**3.35.**  Priority Claim:  A Claim that is entitled to priority under sections 507 or 364 of the Bankruptcy Code, excluding Priority Tax Claims.

**3.36.**  Priority Tax Claim:  A Claim for federal, state or local taxes that is entitled to priority under sections 507 or 364 of the Bankruptcy Code.

**3.37.**  Pro Rata:  A proportionate distribution so that with respect to a particular Claim in a group or Class of Claims, a number (expressed as a percentage) equal to the proportion that the amount of any Allowed Claim in the group or Class bears to the aggregate amount of all Allowed Claims in such group or Class as of the date of determination.

**3.38.**  Secured Claim:  A Claim that is secured by a Lien on property of the Estate or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code, and that has not been avoided.

**3.39.**  Subordinated Claim:  An Allowed Unsecured Claim the payment of which has been subordinated (a) by agreement of the holder of such claim, or (b) an Order of the Court pursuant to section 510(c) of the Bankruptcy Code or other applicable law to the payment of other Allowed Unsecured Claims with a priority equal or higher than that priority set forth in section 726(a)(2) of the Bankruptcy Code.

**3.40.**  Substantial Consummation:  The date on which the Debtor has substantially completed all requirements of the Plan as determined in accordance with § 1101(2) of the Bankruptcy Code.

**3.41.**  Unsecured Claim:  A Claim with a priority equal to that priority set forth in section 726(a)(2) of the Bankruptcy Code.

6

4.    **ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY CLAIMS AND PRIORITY TAX CLAIMS**.  For purposes of the Plan, Administrative Expense Claims, Priority Claims and Priority Tax Claims shall be treated as follows:

4.1.    **Administrative Expense Claims.** Except as provided herein or other Order of the Court, including without limitation, the *Order Establishing Procedure to Determine Section 503(b)(9) Administrative Expenses* entered in this case on September 12, 2018 [Docket No. 105], Administrative Expense Claims shall be allowed upon due request or application and in such amounts as may be determined by the Court after Notice and Hearing.

4.1.1.    Compensation for legal, financial, advisory, accounting and other professional services, and reimbursement of expenses awarded or allowed under sections 329, 330(a) or 331 of the Bankruptcy Code ("Professional Services Claims"), shall be allowed and paid in such amounts as may be determined by the Court until such time as a Final Decree is entered in the case.  Such professionals shall be compensated for services rendered in such capacity and reasonably necessary to the administration of the Estate, upon an hourly basis and at their customary hourly rates not to exceed reasonable compensation for such services.  Requests for allowance of Professional Services Claims shall be filed with the Court on a calendar quarter basis after the Effective Date.

4.1.2.    All fees and charges assessed against the Estate under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930 shall be paid on a quarterly basis in accordance with the Bankruptcy Rules until such time as a Final Report is filed in the case.

4.1.3.    With respect to all other Administrative Expense Claims (other than administrative expense claims under 11 U.S.C. §503(b)(9), for which the deadline to file such claims has already expired), requests for allowance of such Claims shall be filed with the Court within 30 days after the Effective Date, or such other date as may be established by the Court. **ANY SUCH ADMINISTRATIVE EXPENSE CLAIM THAT IS NOT TIMELY FILED SHALL BE DISALLOWED AND THE HOLDER OF SUCH CLAIM SHALL BE FOREVER BARRED, ESTOPPED, AND PERMANENTLY ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE EXPENSE CLAIM AGAINST THE DEBTOR OR ITS ESTATE.**

4.1.4.    Except as otherwise ordered by the Court, the Debtor shall pay to each holder of an Allowed Administrative Expense Claim in full satisfaction, settlement, and

7

release of and in exchange for such Allowed Administrative Expense Claim, an amount in cash equal to the allowed amount of such Claim on or before the later of (i) the Effective Date or (ii) as soon thereafter as the allowed amount of such Claim has been determined by the Court pursuant to a Final Order.

      **4.2.**   **Priority Claims.**  The Debtor shall pay to each holder of an Allowed Priority Claim in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Claim, an amount in cash equal to the allowed amount of such Claim on or before the later of (i) 30 days after the deadline to file objections to Claims has expired pursuant to section 13.1 below, or (ii) if disputed, 30 days after the allowed amount of such Claim has been determined by the Court pursuant to a Final Order.

      **4.3.**   **Priority Tax Claims.**  The Debtor shall pay to each holder of an Allowed Priority Tax Claim in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim, an amount in cash equal to the allowed amount of such Claim, with interest at the applicable statutory rate, on or before the later of (i) 30 days after the deadline to file objections to Claims has expired pursuant to section 13.1 below, or (ii) if disputed, 30 days after the allowed amount of such Claim has been determined by the Court pursuant to a Final Order.

    **5.**    **DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS.** For purposes of the Plan, Claims and Equity Interests are classified as follows:

      **5.1.**   **Class 1** shall consist of all Unsecured Claims.

      **5.2.**   **Class 2** shall consist of all Subordinated Claims.

      **5.3.**   **Class 3** shall consist of all Late Filed Claims.

      **5.4.**   **Class 4** shall consist of all Penalty Claims.

      **5.5.**   **Class 5** shall consist of all Equity Interests.

    **6.**    **TREATMENT OF CLASSES UNDER THE PLAN.**  Claims and Equity Interests shall receive the following treatment under the Plan:

      **6.1.**   **Class 1: Unsecured Claims**.  The Unsecured Claims shall be treated as follows:

        **6.1.1.**  Each holder of an Allowed Unsecured Claim will receive its Pro Rata share of Available Cash.  Distributions to holders of Allowed Unsecured Claims shall be made in one final installment on the date described in Section 13.3.

**6.1.2.**    The Class 1 Unsecured Claims are impaired by the Plan.  Holders of Class 1 Unsecured Claims are entitled to vote to accept or reject the Plan.

**6.2.**    **Class 2: Subordinated Claims**.  The Subordinated Claims shall be treated as follows:

**6.2.1.**    Each holder of an Allowed Subordinated Claim will receive its Pro Rata share of Available Cash after the payment in full of the Class 1 Allowed Unsecured Claims.  Distributions to holders of Allowed Subordinated Claims shall be made in one final installment on the date described in Section 13.3.

**6.2.2.**    The Class 2 Subordinated Claims are impaired by the Plan.  Holders of Class 2 Subordinated Claims are entitled to vote to accept or reject the Plan.

**6.3.**    **Class 3: Late Filed Claims**.  The Late Filed Claims shall be treated as follows:

**6.3.1.**    Each holder of an Allowed Late Filed Claim will receive its Pro Rata share of Available Cash after the payment in full of the Class 1 Allowed Unsecured Claims and the Class 2 Allowed Subordinated Claims.  Distributions to holders of Allowed Late Filed Claims shall be made in one final installment on the date described in Section 13.3.

**6.3.2.**    The Class 3 Late Filed Claims are impaired by the Plan.  Holders of Class 3 Late Filed Claims are entitled to vote to accept or reject the Plan.

**6.4.**    **Class 4:  Penalty Claims**.  The Penalty Claims shall be treated as follows:

**6.4.1.**    Each holder of an Allowed Penalty Claim will receive its Pro Rata share of Available Cash after the payment in full of the Class 1 Allowed Unsecured Claims, the Class 2 Allowed Subordinated Claims, and the Class 3 Allowed Late Filed Claims.  Distributions to holders of Allowed Penalty Claims shall be made in one final installment on the date described in Section 13.3.

**6.4.2.**    The Class 4 Penalty Claims are impaired by the Plan.  Holders of Class 4 Penalty Claims are entitled to vote to accept or reject the Plan.

**6.5.**    **Class 5:  Equity Interests.**  The holders of Equity Interests shall not receive or retain any property on account of such Equity Interests under the Plan; provided however, in the event all Allowed Claims have been paid in full to the extent provided in the Plan, and there is Available Cash remaining for distribution, then (i) holders of Allowed Claims shall be paid interest at the legal rate on such Allowed Claims to the extent necessary to pay each holder of any such

Allowed Claim property of a value, as of the Effective Date, equal to the allowed amount of such claim, and (ii) any remaining Available Cash would be distributed Pro Rata to the holders of Equity Interests.  The Class 5 Equity Interests are impaired.

       7.      **COMPROMISE AND SETTLEMENT OF CARGILL CLAIMS.** Cargill, Incorporated and Cargill Meat Solutions Corporation (collectively, "<u>Cargill</u>") filed Claim Numbers 45 and 47, respectively, in the Debtor's proceeding, each in the amount of $111,172,680 (collectively, the "<u>Cargill Claims</u>").  The Cargill Claims were designated as unsecured claims but are contested by the Debtor and the Committee.  The Cargill Claims are duplicate claims and are related to the judgment obtained by Cargill in January of 2018 against WDS, Inc., Brian Ewert and Jennifer Maier in litigation filed by Cargill in the United States District Court for the Western District of North Carolina.  Confirmation of the Plan shall constitute approval by the Court of a compromise and settlement of the Cargill Claims pursuant to Bankruptcy Rule 9019, as follows:

       7.1.      The Cargill Claims shall be consolidated into Claim Number 47 and Claim Number 45 shall be disallowed as a duplicate claim.

       7.2.      Claim Number 47 shall be allowed as (i) a Class 1 Unsecured Claim in the amount of $8,000,000, (ii) a Class 2 Subordinated Claim in the amount of $32,818,142, and (iii) a Class 4 Penalty Claim in the amount of $70,354,538.

       7.3.      Any recovery by Cargill on the Cargill Claims from a source other than the Debtor's Estate shall be credited against Cargill's allowed Class 2 Subordinated Claim.

       7.4.      Except for the allowance of Claim Number 47 as set forth in Section 7.2 above, the Debtor, on behalf of itself and the Estate, releases Cargill and Cargill releases the Debtor and the Estate from any obligations, liabilities, causes of action, damages, claims, and demands of any kind whatsoever, at law or in equity, direct or indirect, known or unknown, discovered or undiscovered, any element of which arose or accrued on or before the entry of the Confirmation Order.

       7.5.      If the Plan is confirmed, Cargill will support any objection filed by the Debtor seeking the denial or subordination of the scheduled and filed claims of WDS, Inc., ODDS, LLC, RFS, Inc., Brian Ewert and Tracy Ewert.

       8.      **CONFIRMATION WITHOUT ACCEPTANCE BY ALL IMPAIRED CLASSES.** The Debtor shall utilize section 1129(b) of the Bankruptcy Code to satisfy the

requirements for confirmation of the Plan with respect to any impaired Class that has not accepted or is deemed not to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

**9.      MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN.**
The Debtor shall execute and consummate the Plan as follows:

**9.1.      Assets of the Estate.** The Assets of the Debtor shall not vest in any subsequent entity but, rather, will remain assets of the Debtor's Estate and shall be distributed in accordance with the terms of the Plan.

**9.2.      Management and Winding Up.**

**9.2.1.**    From and after the Effective Date, the Debtor shall continue in existence under the control of its Chief Restructuring Officer, The Finley Group, Inc., for the purpose of (i) winding–down its affairs, (ii) liquidating, by conversion to cash or other methods, any remaining Assets as expeditiously as reasonably possible, (iii) enforcing and prosecuting causes of action, claims, interests, rights and privileges of the Debtor and its Estate not otherwise waived, released, or enjoined herein, (iv) resolving Disputed Claims, (v) administering and taking such actions as are necessary to effectuate the Plan, and (vi) filing appropriate tax returns.

**9.2.2.**    Upon the Final Consummation of the Plan, the Debtor shall file a Final Report, the case may be closed, and the Debtor shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtor or payments to be made in connection therewith; provided, however, that the Debtor may file with the Office of the Secretary of State for the State of North Carolina a certificate of dissolution.

**9.3.      Executory Contracts and Leases.**

**9.3.1.**    The Debtor has previously filed motions to assume and assign, or in the alternative to reject, certain executory contracts and unexpired leases.  Except as otherwise set forth in the Confirmation Order, all executory contracts and unexpired leases existing on the Effective Date which have not been assumed and assigned, or in the alternative rejected, pursuant to a prior Order of the Bankruptcy Court shall be deemed rejected and entry of the Confirmation Order shall constitute the approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of such executory contracts and unexpired leases as of the Effective Date.

**9.3.2.**    A Claim for damages arising from the rejection of an executory contract or unexpired lease shall be forever barred and shall not be enforceable against the Debtor's Estate and no holder of any such Claim shall participate in any distribution under the Plan with

11

respect to that Claim unless (i) a Proof of Claim is filed with the Court within thirty (30) days from the Effective Date, or such other deadline as may be set by the Court generally or with respect to any specific lease or contract rejected, and (ii) said Proof of Claim is determined to be an Allowed Claim, either because no timely objection is filed or because the Court allows the Claim after a timely filed objection.

    **9.4.** **Funding on and after the Effective Date**:  After the Effective Date, the Debtor will use cash on hand and proceeds recovered or generated from the liquidation of Assets and from causes of action (including Bankruptcy Causes of Action) to fund payments as and to the extent due under the Plan.

    **9.5.** **Litigation:**  The Debtor shall have the exclusive right to pursue any and all claim objections and causes of action (including all Bankruptcy Causes of Action) not otherwise waived, released or enjoined herein, and any and all such causes of action shall be brought in the Court and shall be governed by Bankruptcy Rules 7001 et seq.  Any compromise or other settlement of a controversy by or on behalf of the Debtor shall be subject to approval by the Bankruptcy Court after notice and hearing, in accordance with the Bankruptcy Rules.

    **9.6.** **Reporting**.  A monthly report for each month the Debtor has been under the supervision of the Court has been and shall continue to be filed by the Debtor with the Court through and including the month immediately preceding the Effective Date.  A consummation status report shall be filed within sixty (60) days after entry of the Confirmation Order and on a quarterly basis thereafter until the filing of the Final Report.  The consummation status report shall set forth a summary of the following:

     **9.6.1.** The payments made or other treatment provided to holders of Allowed Claims in each Class.

     **9.6.2.** Whether the Debtor is in compliance with all distributions and payments required under the Plan.

     **9.6.3.** The status of any pending litigation.

     **9.6.4.** Any pending matters which may require further Court action.

     **9.6.5.** Projected date for filing a Final Report and request for entry of a Final Decree.

   **10.** **EFFECT OF CONFIRMATION OF THE PLAN.**  As the Plan provides for the liquidation of all Assets of the Estate and the Debtor will not engage in business after

consummation of the Plan, the Plan does not provide for the discharge of any Claims or Liabilities. However, all proceedings and court actions seeking to establish or enforce pre-petition Liabilities and Claims of any nature against property of the Estate or priorities received or retained by any creditor with respect to debts and obligations of the Debtor shall be permanently stayed and treated as specifically provided in the Plan.

**11.** **PROVISIONS FOR RETENTION OF JURISDICTION AND PROSECUTION AND DEFENSE OF CLAIMS AND CAUSES OF ACTION**.  The Court shall retain and may exercise its jurisdiction for determination in this case of any objections to claims not disposed of prior to or as a result of the entry of the Confirmation Order, the final determination of any causes of action (including Bankruptcy Causes of Action) brought in the Court, and matters reasonably necessary to implement the Plan to the extent legally permissible, including, but not limited to the following:

**11.1.**  **General Jurisdiction**: Until the entry of a Final Decree, the Court shall retain jurisdiction as permissible under section 1142 of the Bankruptcy Code and Bankruptcy Rules 3020(d) and 3021 to the extent necessary to implement the Plan; to hear and determine all claims against the Debtor; to hear, determine, and enforce all causes of action (including all Bankruptcy Causes of Action) arising in, arising under, or related to this case and which may exist on behalf of the Debtor; and, to confirm after Notice and Hearing (except as otherwise provided herein) any proposed compromise of any cause of action (including all Bankruptcy Causes of Action).

**11.2.**  **Causes of Action**:  The Debtor shall retain the right and standing to assert and shall have the sole and exclusive right to commence, pursue, settle, compromise, abandon, waive, or release any claim or cause of action which may exist on behalf of the Debtor (including Bankruptcy Causes of Action) which accrued and was asserted or capable of assertion by the Debtor as a debtor-in-possession as of the Petition Date and that is not otherwise released, settled, enjoined or otherwise compromised by the terms of this Plan or the Confirmation Order.

**11.3.**  **Specific Retention of Powers**:  In addition to the general provisions set forth above and notwithstanding the entry of the Confirmation Order, the occurrence of the Effective Date of the Plan, and the occurrence of Substantial Consummation of the Plan, the Court shall retain such jurisdiction over this case as is legally permissibly, *inter alia*, by Final Order or judgment:

**11.3.1.** To classify, allow, disallow, determine, liquidate, reduce, reclassify, subordinate, estimate or establish the priority or secured or unsecured status (or proper Plan classification) of any Claim or Equity Interest including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims or Equity Interests, and to direct distributions of funds under the Plan, and to hear and determine any controversies pertaining thereto.

**11.3.2.** To hear and determine any and all applications, adversary proceedings or other matters arising out of or related to the Plan.

**11.3.3.** To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed.

**11.3.4.** To liquidate or estimate the amount of any Claim, or to determine the manner and time for such liquidation or estimation in connection with any contingent or unliquidated Claim.

**11.3.5.** To adjudicate all disputes with respect to Claims or any Lien on any Asset of the Debtor.

**11.3.6.** To adjudicate all claims or controversies arising during the pendency of this case.

**11.3.7.** To liquidate all Assets, including recoveries on all claims and causes of action brought or capable of being brought by or on behalf of the Debtor prior or subsequent to Substantial Consummation of the Plan that are not released, settled or otherwise compromised by the terms of this Plan.

**11.3.8.** To hear and determine matters covering federal, state, and local taxes pursuant to sections 346, 505, and 1146 of the Bankruptcy Code.

**11.3.9.** To allow fees and reimbursement of Administrative Expense Claims including the expenses of professional persons employed during this case, or any other person or entity applying for compensation.

**11.3.10.** To construe or enforce the Plan so as to effectuate payments thereunder or to compel performance by any person reasonably necessary to achieve Final Consummation in accordance with the provisions hereof.

**11.3.11.** To make and enforce such orders as are necessary or

14

appropriate to implement, carry out or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order.

**11.3.12.**     To enter such orders as may be necessary and proper for the orderly administration of the Debtor's case.

**11.3.13.**     To decide such other matters and for such other purposes as may be provided for in the Confirmation Order.

**11.3.14.**     To resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom.

**11.3.15.**     To approve any modification of (i) the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; (ii) the Confirmation Order; or (iii) any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan.

**11.3.16.**     To issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any person or entity with consummation, implementation or enforcement of the Plan or the Confirmation Order.

**11.3.17.**     To determine any other matters that may arise in connection with, or relate to, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan or the Confirmation Order.

**11.3.18.**     To consider and approve the compromise and settlement of any Claim or cause of action, to the extent that Court approval is required or permitted.

**11.3.19.**     To resolve any matter relating to the sale, liquidation, abandonment or other disposition of any Assets.

**11.3.20.**     To enforce or clarify any orders previously entered by the Court in this case.

**11.3.21.**     To enter a Final Decree closing this case.

15

        **11.3.22.**      To hear any other matter not inconsistent with the Bankruptcy Code.

        **11.4.**   **Other Courts**.  If the Court abstains from exercising, declines to exercise or is otherwise without jurisdiction over any matter arising out of this case, this Section 11 shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

      **12.**    **PROVISIONS FOR AMENDMENT OF THE PLAN.**  The Plan may be modified as follows:

        **12.1.**   **Non-material Amendment**:  This Plan may be altered or modified by the Debtor after its submission for acceptance and before or after its confirmation, without Notice and Hearing, if the alteration or modification does not adversely change the priority, allowance, or treatment of the Claim of any creditor as provided in section 1127 of the Bankruptcy Code and in Bankruptcy Rule 3019.

        **12.2.**   **Material Amendment**:  This Plan may be altered or modified by the Debtor after submission for acceptance and before or after confirmation in a manner which adversely affects the interests of creditors only (i) as provided in section 1127 of the Bankruptcy Code and in Bankruptcy Rule 3019, or (ii) with the written consent of the creditor or creditors who are adversely affected.

      **13.**    **OBJECTIONS TO CLAIMS, RESERVES AND DISTRIBUTIONS**

        **13.1.**   **Claims**: The Debtor may file an objection to any Claim, other than a Claim which has been previously allowed by Final Order or the Cargill Claims as allowed by the Cargill Settlement, within one hundred twenty (120) days after the Effective Date.  Objections not filed within such time shall be deemed waived unless the period within which to file objections to claims is extended by the Court in response to one or more motions for such extension filed prior to the expiration of the then existing period for such objections to be filed.  **THE ABSENCE OF AN OBJECTION TO A CLAIM PRIOR TO THE CONFIRMATION DATE, WHETHER AS TO A SCHEDULED OR FILED CLAIM, SHALL NOT BE DEEMED AN ACCEPTANCE OF ANY CLAIM NOR A WAIVER OF THE RIGHT TO OBJECT TO ANY CLAIM, AND THE HOLDER OF ANY SUCH CLAIM SHALL NOT BE ENTITLED TO ASSERT RELIANCE UPON ANY IMPLIED ACCEPTANCE OF SUCH CLAIM WHEN VOTING TO ACCEPT OR REJECT THE PLAN.**

13.2. **Reserves**: Any Claim, or portion thereof, which is to be paid in cash under the Plan and which is a Disputed Claim, shall be protected by requiring the Debtor to segregate and set aside in an escrow account a reserve based on the Court's estimate of such Claim and sufficient to treat said Claim in the same fashion as though the objection were denied and such Claim were deemed an Allowed Claim. The reserve so segregated shall be distributed in accordance with the Plan in the event the objection is overruled, or a dispute is resolved in favor of the party asserting the Claim. In the event the Disputed Claim is disallowed, the retained cash so segregated shall be retained by the Debtor on behalf of the Estate and available for distribution in accordance with the provisions of this Plan, with the disallowed claim being excluded from the appropriate Class.

13.3. **Distributions.**

13.3.1. **Timing of Distributions.** The Debtor shall make distributions to holders of Allowed Administrative Expense Claims, Allowed Priority Claims, and Allowed Priority Tax Claims as provided in Section 4 of the Plan. The Debtor shall make one final distribution to holders of Allowed Claims in Classes 1 through 5 (the "Class Distributions") on a date determined by the Debtor prior to the filing of the Final Report; provided, however, no Class Distributions shall be made until after the claims review process has been completed and Final Orders have been entered with respect to all Disputed Claims. Prior to making the Class Distributions, the Debtor shall file a preliminary report with the Court setting forth the proposed Class Distributions to holders of Allowed Claims in Classes 1 through 5 (the "Preliminary Report"). The Debtor shall serve the Preliminary Report on all parties in interest and shall file a certificate of service with the Court. Any holder of an Allowed Claim in Classes 1 through 5 wishing to object to the proposed Class Distributions set forth in the Preliminary Report must file a written objection with the Court within thirty (30) days after service of the Preliminary Report by the Debtor (the "Objection Deadline"). If an objection is filed on or before the Objection Deadline, a hearing will be held on the proposed Class Distributions at a time determined by the Court. In no objections are filed, then the Debtor may pay the Class Distributions pursuant to the Preliminary Report without further order of the Court. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a business day, then the making of such payment or the performance of such act may be completed on the next succeeding business day but shall be deemed to have been completed as of the required date.

17

**13.3.2. Delivery of Distributions.**  Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the schedules filed with the Court unless superseded by the address as set forth on the proof of claim filed by such holders or other subsequent writing notifying the Debtor of a change of address.

**13.3.3. Minimum Distributions; Undeliverable and Unclaimed Distributions.**  No interim or final distribution shall be made in an amount less than $5.00, and any such distributions shall instead be paid over to the U.S. Treasury as provided in section 347 of the Bankruptcy Code and Bankruptcy Rule 3010 for small dividends as in a Chapter 7 proceeding. If any holder's distribution is returned as undeliverable, no further distributions to such holder shall be made unless and until the Debtor has been notified of such holder's then current address, at which time all missed distributions shall be made to such holder, without additional interest, from the date of the first attempted distribution.  All unclaimed distributions which exist as of the date of the final distribution to holders of Allowed Claims shall be paid over to the U.S. Treasury as provided in section 347 of the Bankruptcy Code and Bankruptcy Rule 3011 for unclaimed distributions as in a Chapter 7 proceeding.  Checks issued by the Debtor in respect of Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof.  Requests for re-issuance of any check shall be made to the Debtor by the holder of the Allowed Claim with respect to which such check originally was issued.

**13.3.4. Setoffs.**  The Debtor may, in accordance with section 553 of the Bankruptcy Code and applicable non-bankruptcy law, set off against any Allowed Claim the distributions to be made pursuant to this Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and causes of action of any nature that the Debtor on behalf of the Estate may possess against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Estate of any such claims, rights and causes of action that it may possess against such holder; and provided further, that any claims of the Debtor arising before the Petition Date shall first be set off against Claims against the Debtor arising before the Petition Date.

**14.    GENERAL PROVISIONS**

**14.1.    Debtor.**  Until the entry of a Final Decree and completion of all payments contemplated by the Plan, or otherwise ordered by the Court, the Debtor shall continue to have

18

and exercise all of the powers and duties of a debtor-in-possession as provided in section 1107 of the Bankruptcy Code.

14.2. **Exculpation.** Neither the Debtor nor any of its respective officers, directors, employees, advisors, attorneys, accountants, consultants or agents shall have or incur any liability for or to any holder of a Claim or Equity Interest for any act or omission after the Petition Date and through the Effective Date in connection with, or arising out of, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for actual fraud, willful misconduct, gross negligence, or criminal act and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

14.3. **Conditions Precedent to the Effectiveness of the Plan.**

14.3.1. On August 30, 2019, the Debtor, Cargill, Bank Capital Services, LLC d/b/a F.N.B. Equipment Finance, James B. Angell, in his capacity as Chapter 7 trustee for Brian C. Ewert acting for the Brian C. Ewert bankruptcy estate and acting as manager of ODDS, LLC, DLP Holdings, LLC and Jet Me Around, LLC, and Everett B. Saslow, Jr., in his capacity as Chapter 7 trustee for RFS, Inc., entered into a comprehensive Settlement Agreement resolving claims by and among the parties (the "Global Settlement Agreement"). Confirmation of the Plan is contingent upon the entry by the Bankruptcy Court of a final order that is not subject to appeal approving the Global Settlement Agreement.

14.3.2. Except as set forth in Section 14.3.1 above, there are no conditions precedent to confirmation of the Plan.

14.4. **Injunctions or Stays.** Unless otherwise provided in the Plan, the Confirmation Order or other orders of the Court, all injunctions or stays generally provided for chapter 11 cases under section 362 of the Bankruptcy Code shall terminate upon the entry of the Final Decree.

14.5. **Committee Dissolved.** The Committee shall remain in existence until Class Distributions are made pursuant to Section 13.3 of the Plan, and thereafter, the Committee shall be dissolved and its members shall be released and discharged from all further authority, duties, responsibilities, and obligations relating to and arising from the Debtor's Chapter 11 case; provided however, (i) after the Effective Date, the Committee's role shall be limited to ensuring that Class Distributions are made consistent with the Plan, and (ii) the amount paid by the Debtor

19

or its estate to professionals retained by the Committee ("Committee Counsel") for fees incurred after the Effective Date shall be capped at $5,000, provided that the Class Distributions are made in accordance with the Plan.  The retention and employment of Committee Counsel shall terminate upon the dissolution of the Committee as set forth herein.

**14.6.** **Binding Effect.** The Plan shall be binding upon and inure to the benefit of the Debtor, holders of Claims and Equity Interests, and their respective successors and assigns.

**14.7.** **Notices.**  Any notice required to be provided to parties in interest under the Bankruptcy Code or Bankruptcy Rules, or under the Plan or any documents executed in conjunction with the Plan, shall be in writing and served by (a) regular mail, postage prepaid, (b) hand delivery, or (c) overnight delivery service, addressed to the appropriate parties and with copies of any such notice to be sent to the Bankruptcy Administrator and counsel for the Debtor.

**14.8.** **Governing Law.**  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of North Carolina shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan.

Date: September 9, 2019

Diverse Label Printing, LLC

BY:

/s/ Vicki L. Parrott

**Counsel for the Debtor:**
John A. Northen, NCSB #6789
jan@nbfirm.com
Vicki L. Parrott, NCSB #25449
vlp@nbfirm.com
Northen Blue, LLP
Post Office Box 2208
Chapel Hill, NC 27515-2208
Telephone:  919-968-4441

20

**EXHIBIT 2:**
**SCHEDULED AND FILED CLAIMS, BY CLASS**

EXHIBIT 2

**Schedule of Scheduled and Filed Claims, by Class**

| Administrative Expense Claims | Creditor | | Estimated Amount | Comments |
|---|---|---|---|---|
| Professional | Northen Blue, LLP | | $250,000.00 | Counsel for the Debtor |
| | Shumaker, Loop & Kendrick, LLP | | $120,000.00 | Counsel for the Committee |
| | The Finley Group, Inc. | | $80,000.00 | CRO |
| | Nelson & Company, PA | | $15,000.00 | Accountant |
| Fees | Bankruptcy - Quarterly Fees | | $20,000.00 | |
| | | | $485,000.00 | |
| | | | | |
| 503(b)(9) | Alros Products Ltd. (Compass) | 60 | $346,697.04 | |
| | Avery Dennison Corp. | 19 | $82,188.46 | |
| | Berry Global, Inc. | 50 | $214,632.12 | |
| | Dolco, LLC (Commodore) | 49 | $20,424.00 | |
| | Green Bay Packaging | 51 | $12,709.77 | |
| | Spinnaker Coating, LLC | N/A | $49,502.73 | |
| | UPM Raflatac, Inc. | 41 | $8,113.35 | |
| | **Total** | | $734,267.47 | |

| Priority Tax Claims | Creditor | Scheduled Amount | Claim No. | Filed Amount | Adjusted Amount | Comments |
|---|---|---|---|---|---|---|
| | Alamance County Tax | | 22 | $19,209.88 | | |
| | Ca. Franchise Board | | 36 | $5,873.07 | | |
| | Colorado Dept. of Revenue | | 25 | $514.00 | | |
| | Internal Revenue Service | | 21 | $3,791.12 | | Objection to claim has been filed |
| | Nebraska DOR | | 40 | $220.33 | | |
| | Ohio Dept. of Taxation | | 17 | $161.46 | | Claim Amended 8/22/19 |
| | City of Burlington | | 62 | $19,447.54 | | |
| | NCDOR | $8,696.00 | 63 | $30.52 | | |
| | Ohio Bureau of Worker's Compensation | | 67 | $23.25 | | |
| | **Total** | | | $49,271.17 | | |

| Class 1 Unsecured Claims | Creditor | Scheduled Amount | Claim No. | Filed Amount | Adjusted Amount | Comments |
|---|---|---|---|---|---|---|
| | AAA Cooper Transportation | | 37 | $286.52 | $286.52 | |
| | Accles & Shelvoke Inc. | $24,629.29 | 42 | $33,822.54 | $24,629.29 | Order Doc. No. 442 |
| | ACHEM Industry America, Inc. | $244.08 | | | $244.08 | |
| | Allied Electronics, Inc. | $21.00 | | | $21.00 | |
| | Alros Products Ltd. (Compass) | $968,879.74 | 60 | $1,006,932.64 | $660,235.60 | Consent Order Doc. No. 431 |
| | AmeriPride Services, Inc. | $107.94 | | | $107.94 | |
| | Averitt Express Inc. | $99.92 | | | $99.92 | |
| | Avery Dennison Corp. | $236,119.58 | 27 | $187,910.86 | $187,910.86 | Consent Order Doc. No. 412 |
| | Bank Capital Services | | 30 | $19,569.42 | $19,569.42 | Per Final Cash Collateral Order |
| | Bank Capital Services | | 31 | $472,857.56 | $381,607.56 | Per Final Cash Collateral Order |
| | Bank Capital Services | | 32 | $431,415.52 | $340,165.52 | Per Final Cash Collateral Order |
| | Bank Capital Services | | 33 | $673,175.34 | $673,175.34 | Per Final Cash Collateral Order |
| | Bank Capital Services | $1,639,827.00 | 43 | $441,670.54 | $0.00 | Per Global Settlement Agreement |
| | Berry Global, Inc. | $109,249.70 | 50 | $334,349.55 | $119,717.43 | Order Doc. No. 437 |
| | Box Board Products | $1,968.95 | 11 | $3,699.46 | $3,699.46 | |
| | Brilliant Endeavors, LLC | $5,110.00 | 39 | $8,430.00 | $8,430.00 | |
| | Ca. Franchise Board | | 36 | $1,610.25 | $1,610.25 | Part Priority Tax Claim |
| | Caraustar Industries, Inc. | $2,753.11 | 44 | $3,825.61 | $3,825.61 | |
| | Cargill / Cargill Meat | $298,000.00 | 45, 47 | $111,172,680.00 | $8,000,000.00 | Per Cargill Settlement |
| | Carolina Machine & Tool | $2,031.90 | | | $2,031.90 | |
| | Century Systems, Inc. | $870.13 | | | $870.13 | |
| | Cintas | $49.16 | | | $49.16 | |
| | Colorado Dept. of Revenue | | 25 | $33.00 | $33.00 | Part Priority Tax Claim |
| | Consolidated Communications | $409.94 | | | $409.94 | |
| | Daniel McBride | $264.00 | | | $264.00 | |
| | Dayton Freight Lines, Inc. | $346.16 | 20 | $478.24 | $478.24 | |
| | DBT Coatings, LLC | $1,200.00 | 7 | $3,480.00 | $3,480.00 | |
| | Desiccare Inc. | $28,705.08 | | | $28,705.08 | |
| | Dexter Russell | $11,442.86 | | | $11,442.86 | |
| | Diamond Marketing Group | $659.17 | | | $659.17 | |
| | Dietech | $120.00 | | | $120.00 | |
| | DNP IMS America Corp. | $2,849.80 | | | $2,849.80 | |
| | EAN Services, LLC | $3,970.33 | 4 | $5,142.00 | $5,142.00 | |
| | Environmental Inks | $1,991.76 | | | $1,991.76 | |
| | ERB Industries | $420.10 | 2 | $2,734.18 | $2,734.18 | |
| | Estes Express Lines | $1,120.48 | 3 | $4,848.20 | $4,848.20 | |
| | Euler Hermes N.A. Ins. Co.; Winpack | $62,409.44 | 8, 9 | $180,993.00 | $180,993.00 | Claim No. 9 withdrawn |
| | Ewert, Brian | | 58 | Unknown | $0.00 | Per Global Settlement Agreement |
| | Ewert, Tracy | | 59 | Unknown | $0.00 | Objection to be filed or Claim to be withdrawn |
| | Fedex Corporate Services | | 29 | $2,756.66 | $2,756.66 | |
| | Infiniti Logistics, Inc. | $618.00 | | | $618.00 | |
| | Internal Revenue Service | | 21 | $9,148.32 | $9,148.32 | Part Priority Tax Claim |
| | J.J. Short Associates, Inc. | | 65 | $1,449.28 | $1,449.28 | |
| | Knecht North America Inc. | $15,253.23 | | | $15,253.23 | |

EXHIBIT 2

Schedule of Scheduled and Filed Claims, by Class

| Creditor | Scheduled Amount | Claim No. | Filed Amount | Amount | Comments |
|---|---|---|---|---|---|
| Lake Graphics, Label & Sign Co., Inc. | $5,697.27 | | | $5,697.27 | |
| Lewis System & Service Co., Inc. | $675.00 | | | $675.00 | |
| Lift Parts Services, Llc | | 38 | $4,265.64 | $4,265.64 | |
| MACTAC | $1,287.36 | | | $1,287.36 | |
| Mark Andy | $140.40 | | | $140.40 | |
| McMaster-Carr Supply Co. | $101.36 | 10 | $397.62 | $397.62 | |
| Multi-Plastics Inc. | $166.18 | | | $166.18 | |
| N-Stock Box, Inc. | $24,499.59 | | $24,499.59 | $24,499.59 | |
| NCDOR | | 63 | $154.08 | $154.08 | |
| ODDS | $1,274,351.00 | 57 | $1,274,351.00 | $0.00 | Per Global Settlement Agreement |
| Ohio Chemical | $3,472.88 | | | $3,472.88 | |
| Ohio Dept. of Taxation | | 17 | $6,577.50 | $6,577.50 | Part Priority Tax Claim |
| Office Depot | | 1 | $1,222.24 | $1,222.24 | |
| Pactiv, LLC | $162,934.65 | 5 | $276,007.21 | $276,007.21 | |
| Patty Paper, Inc. | $1,631.21 | 14 | $7,827.83 | $7,827.83 | |
| Paula Renee Franklin | $100.00 | | | $100.00 | |
| PeopleReady | | 28 | $6,878.31 | $6,878.31 | |
| Port Royal Packaging, Inc. | | 55 | $35,832.00 | $35,832.00 | |
| Pratt Industries, Inc. | $3,509.95 | | | $3,509.95 | |
| Presto-X (KC) | $138.00 | | | $138.00 | |
| Presto-X (Memphis) | $408.00 | | | $408.00 | |
| Prodrivers | $25,376.06 | 6 | $27,062.42 | $27,062.42 | Designated as contingent, disputed or unliquidated |
| Quill Corporation | $173.96 | | | $173.96 | |
| RFS, Inc. | $10,730.00 | | | $0.00 | Per Global Settlement Agreement |
| Roto-Plate | $13,086.46 | | | $13,086.46 | |
| Rotometrics | $2,151.18 | | | $2,151.18 | |
| Saia Motor Freight, Inc. | $1,178.89 | 34 | $2,053.10 | $2,053.10 | |
| SAIA Motor Freight Line LLC | $188.01 | | | $188.01 | |
| ScanSource, Inc. | $1,602.45 | 26 | $1,679.21 | $1,679.21 | |
| Sigma Supply of North Am. | $66,794.70 | | | $66,794.70 | |
| Southeastern Freight Lines,Inc. | | 15 | $2,398.08 | $2,398.08 | |
| Sparkletts | $20.52 | | | $20.52 | |
| Spinnaker Coating | $91,910.43 | | | $42,407.70 | Part 503(b)(9); Objection to be filed |
| SumnerOne | $92.94 | | | $92.94 | |
| Taghleef Industries | | 16 | $14,884.20 | $14,884.20 | |
| Technicote | $30,140.40 | 23 | $27,680.13 | $27,680.13 | |
| The Safety Zone | $137.85 | | | $137.85 | |
| Time Warner Cable | | 12 | $704.29 | $704.29 | |
| Tyson Fresh Meats | | 46 | $55,424.92 | $0.00 | Setoff per court order - $55,424.92 |
| US Bank Equpment Finance | $95.93 | | | $95.93 | |
| Uline | $819.75 | 52 | $1,278.34 | $1,278.34 | Filed as 503(b)(9) |
| UPM Raflatac Inc. | $10,813.12 | 41 | $10,813.12 | $2,699.77 | Part 503(b)(9); Objection to be filed |
| Village Harbor Owners Assoc. | $550.28 | | | $550.28 | |
| Volk Enterprises, Inc. | $24,706.32 | | | $24,706.32 | |
| Vondrehle Corp. | $1,142.40 | 13 | $1,409.40 | $1,409.40 | |
| Waste Industries | | 35 | $1,604.87 | $1,604.87 | |
| WDS, Inc. | $1,188,308.00 | 56 | $1,188,308.00 | $1,188,308.00 | Disputed - Objection filed |
| Wichita Stag 2, LLC | $5,322.37 | 53 | $151,467.82 | $151,467.82 | Disputed; Part Secured - -$18,958.33 Sec. Deposit |
| Wichita Stag 1, LLC | | 54 | $96,246.95 | $96,246.95 | Disputed |
| XTRA lease, LLC | $62,803.87 | 48 | $78,893.75 | $78,893.75 | Designated as contingent, disputed or unliquidated |
| Zeller Gmelin | $2,920.34 | 24 | $12,515.42 | $12,515.42 | |
| Zip-Net Inc. | $12,636.58 | | | $12,636.58 | |
| | | | | $12,854,848.95 | |

| Class 2 Subordinated Claims | Creditor | Scheduled Amount | Claim No. | Filed Amount | Comments |
|---|---|---|---|---|---|
| | Cargill, Inc. / Cargill Meat Solutions Corp. | | 47 | $32,818,142.00 | $32,818,142.00 Subordinated as part of Cargill Settlement |

| Class 3 Late Filed Claims | Creditor | Scheduled Amount | Claim No. | Filed Amount | Amount | Comments |
|---|---|---|---|---|---|---|
| | C.H. Robinson Worldwide Inc. | | 61 | $18,818.96 | $18,818.96 | Claim Filed 11/28/19 |
| | N-Stock Box, Inc. | $24,499.59 | 64 | $24,531.44 | $31.85 | Claim Filed 1/15/19; See Class 1 Scheduled Claim |
| | Troy Nettles | | 66 | $2,489.75 | $2,489.75 | Claim Filed 4/16/19 |
| | Framarx Corporation | | 68 | $1,242.20 | $1,242.20 | Claim Filed 8/2/19 |
| | | | | | $22,582.76 | |

| Class 4 Penalty Claims | Creditor | Scheduled Amount | Claim No. | Filed Amount | Amout | Comments |
|---|---|---|---|---|---|---|
| | Cargill, Inc. / Cargill Meat Solutions Corp. | | 47 | $70,354,538.00 | $70,354,538.00 | Trebled damages in Western District Litigation |

| Class 5 Equity Interests | Equity Interest Holder | | | | Comments |
|---|---|---|---|---|---|
| | Brian Ewert | 90.00% | | | Membership Interest as of the Petition Date |
| | James W. Maier | 10.00% | | | Membership Interest as of the Petition Date |

**EXHIBITS 3:**
**PROJECTION AS TO PLAN PAYMENTS**

**EXHIBIT 3**
**Projection as to Plan Payments**
**WDS Claim Disallowed**

| Assets | Amount | Disbursements | % | Notes |
|---|---|---|---|---|
| Cash on hand | 6,744,424 | 6,744,424 | | Cash available as of 7/31/19 |
| Bcky C/A, Preferences | 7,900,000 | 237,000 | | 3% recovery |
| **Sub-total** | | 6,981,424 | | |

| Claims | | | | |
|---|---|---|---|---|
| Administrative Exp. Claims | 485,000 | 485,000 | 100% | Paid in full |
| Priority Tax Claims | 49,271 | 49,271 | 100% | Paid in full |
| Class 1:  Unsecured Claims | 11,903,541 | 6,447,153 | 54% | Includes 502(h) Claims |
| Class 2:  Subordinated Claims | 32,818,142 | 0 | 0% | No distribution |
| Class 3:  Late Filed Claims | 22,583 | 0 | 0% | No distribution |
| Class 4: Penalty Claims | 70,354,538 | 0 | 0% | No distribution |

| Equity Interests | | | | |
|---|---|---|---|---|
| Class 5: Equity Interests | | | 0% | No distribution |

**EXHIBIT 4:**
**CHAPTER 7 LIQUIDATION ANALYSIS**

**EXHIBIT 4**
**Liquidation Analysis as of July 31, 2019**
**WDS Claim Disallowed**

| | Amount | Liquidation Pursuant To Proposed Plan | Liquidation Pursuant To Chapter 7 |
|---|---|---|---|
| **Assets** | | | |
| Cash on hand | $6,744,424.00 | $6,744,424.00 | $6,744,424.00 |
| Bcky C/A, Preferences (3% recovery) | $7,900,000.00 | $237,000.00 | $237,000.00 |
| | | $6,981,424.00 | $6,981,424.00 |
| | | | |
| **Claims** | | | |
| Less Chapter 11 Administrative Claims | | | |
| Professional Fees and Expenses | | $465,000.00 | $275,000.00 |
| Statutory Fees | | $20,000.00 | $1,625.00 |
| Total Chapter 11 Administrative Claims | | $485,000.00 | $276,625.00 |
| | | | |
| Less Chapter 7 Administrative Claims | | | |
| Trustee's Commission | | $0.00 | $233,000.00 |
| Professional Fees and Expenses | | $0.00 | $250,000.00 |
| Total Chapter 7 Administrative Claims | | $0.00 | $483,000.00 |
| | | | |
| Less Priority Tax Claims | $49,271.00 | $49,271.00 | $49,271.00 |
| | | | |
| Available Cash for Classes 1 - 5 | | $6,447,153.00 | $6,172,528.00 |
| | | | |
| Class 1:  Unsecured Claims | $11,903,541.00 | $6,447,153.00 | $6,172,528.00 |
| Class 2:  Subordinated Claims | $32,818,142.00 | $0.00 | $0.00 |
| Class 3:  Late Filed Claims | $22,583.00 | $0.00 | $0.00 |
| Class 4: Penalty Claims | $70,354,538.00 | $0.00 | $0.00 |
| Class 5: Equity Interests | N/A | $0.00 | $0.00 |

**Note:  Cargill will not agree to subordinate a portion of its claim in a Liquidation pursuant to Chapter 7. Additionally, the claims subject to the Global Settlement Agreement will not be withdrawn.**